| | Partial Reproduction of Exhibit 11–K | | | Tax | Deficiency |
|---|---|---|---|---|---|
| Item | Cost | McNemar | Willis | return | notice |
| 1279 | $20 | | | $1,400 | $1,250 |
| 1281 | 20 | | | 1,400 | 1,000 |
| 102 | 200 | $6,500 | $800 | 8,125 | 500 |
| 103 | 200 | 6,800 | 800 | 8,500 | 450 |
| 182 | 30 | 500 | 150 | 1,250 | 50 |
| 268 | 1,400 | 42,000 | 2,000 | 52,500 | 700 |
| 353 | 210 | 4,000 | 900 | 6,250 | 250 |
| 586 | 30 | 500 | 150 | 1,750 | 200 |
| 905 | 125 | 1,600 | | 3,750 | 2,500 |
| 906 | 125 | 1,800 | | 3,750 | 2,500 |
| 948 | 125 | 3,300 | | 4,125 | 1,000 |
| 949 | 200 | 4,200 | | 4,375 | 1,000 |
| 954 | 200 | 5,300 | | 6,625 | 600 |
| 964 | 200 | 6,000 | | 7,500 | 550 |
| 966 | 225 | 6,200 | | 7,750 | 650 |

# DENNIS S. BROWN, ET AL.,[1] PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 29929–82, 2313–83     Filed December 18, 1985.
3083–83, 3503–83.

*Joseph Wetzel* and *Russell Sandor*, for the petitioners.
*Ralph C. Jones* and *Joyce Britt*, for the respondent.

SHIELDS, *Judge*: Respondent determined deficiencies in petitioners' Federal income tax as follows:

---

[1] Cases of James E. Sochin, docket No. 2313–83; Ellison C. Morgan and Linda Morgan, docket No. 3083–83; and James N. Leinbach and Mary Alice Leinbach, docket No. 3503–83, were consolidated herewith for trial, briefing, and opinion.

| Petitioner [2] | Year | Deficiency | Additions to tax sec. 6653(a)[3] |
|---|---|---|---|
| Brown | 1979 | $49,562.50 | |
| Sochin | 1979 | 9,402.00 | |
| | 1980 | 25,535.00 | |
| | 1981 | 18,288.00 | |
| Morgan | 1977 | 2,283.00 | $114.00 |
| | 1979 | 104,022.00 | 5,217.35 |
| | 1980 | 194,141.55 | 10,141.55 |
| Leinbach | 1979 | 205,181.69 | |
| | 1980 | 263,728.31 | |
| | 1981 | 218,036.46 | |

After concessions, the issues remaining for decision are: (1) Whether petitioners realized deductible losses under section 165(c)(2) on forward contracts as claimed on their income tax returns for 1979, 1980, and/or 1981; (2) whether the fees paid by petitioners with respect to such contracts are deductible; (3) whether petitioners, Ellison C. Morgan and Linda Morgan, are liable for additions to tax under section 6653(a); and (4) whether any of the petitioners are liable for damages under section 6673.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations and exhibits associated therewith are incorporated herein by reference.

All of the petitioners resided in Oregon at the time their petitions were filed, and all of them filed income tax returns for 1979, 1980, and 1981 with the Internal Revenue Service Center at Ogden, Utah. On the returns, petitioners claimed to have suffered losses in the following amounts from the cancellation of forward contracts for the purchase or sale of certain mortgage certificates:

---

[2] Since Linda Morgan and Mary Alice Leinbach are petitioners solely because they filed joint returns with their husbands, the word "petitioners" as used hereinafter will refer only to the male petitioners unless otherwise indicated.

[3] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue. All rule references are to the Tax Court Rules of Practice and Procedure.

| Petitioner | Year | Loss claimed |
|------------|------|--------------|
| Brown | 1979 | $106,160 |
| Sochin | 1979 | 20,621 |
| | 1980 | 48,054 |
| | 1981 | 38,785 |
| Morgan | 1979 | 224,416 |
| | 1980 | 390,614 |
| Leinbach | 1979 | 394,676 |
| | 1980 | 482,245 |
| | 1981 | 401,412 |

All of the above losses allegedly[4] occurred with respect to activities promoted by Gregory Government Securities, Inc., and Gregory Investment & Management, Inc. Over 1,400 other cases now pending before this Court have been identified as involving similar issues and factual situations. Upon learning of the number of such cases, the Chief Judge assigned all of them to this division of the Court. With the assistance of respondent and his counsel, and most of the 1,400 petitioners and their counsel, these four cases were selected as being generally representative with respect to the issues common to all the cases.[5] An order was then entered consolidating these four cases and setting them for trial of the common issues while all activity in the other cases was suspended pending the decision herein.

Gregory Government Securities, Inc. (GGS), and Gregory Investment & Management, Inc. (GIM) were incorporated in 1979 by William H. Gregory under the laws of the State of Oregon. At all times material to these cases, all of the stock outstanding in both corporations was owned by Mr. Gregory and his wife, and their corporate activities were conducted under his general supervision and control. Prior to 1979, Mr. Gregory had been the tax partner and a specialist in accounting for wood products with Arthur Andersen & Co., an international accounting firm. He was also the chairman of the firm's steering committee on tax shelters. He left Arthur

---

[4]The use in our findings of such words and phrases as loss, gain, forward contract, cancellation, assignment, spread, straddle, short position, long position, transactions and similar words and phrases are for convenience only and are not to be construed as a determination of the nature of any act or thing.

[5]The additional loss issue raised by petitioner Morgan in his amended pleading filed Apr. 19, 1984, was not considered herein because these proceedings deal only with the issues common to all petitioners. The additional issue will be considered in a later proceeding.

Andersen in July of 1979 in order to establish GGS and GIM. Shortly after its organization, GGS was registered with the Oregon Department of Commerce as a broker-dealer in securities. The registration continued through the balance of 1979 and throughout 1980 and 1981. No such registration was required of GIM in Oregon. Neither corporation was required to be registered as a broker-dealer under the Securities Exchange Act of 1934.

The promotion undertaken in 1979 by Mr. Gregory was purportedly to offer to "a limited number of knowledgeable, sophisticated investors, * * * who understand both the economic and tax ramifications of the transactions," investments in forward contracts to purchase or to sell certificates issued by Government National Mortgage Association and Federal Home Loan Mortgage Corporation. These certificates are exempt from federal registration under the Securities Act of 1933. His program contemplated that GIM would serve as a financial adviser to the prospective investors, and GGS, as a registered broker-dealer, would serve as either a seller or a buyer on every transaction entered into with the investors.

Government National Mortgage Association (GNMA) is a corporation wholly owned by the Government through the Department of Housing and Urban Development. From time to time, GNMA issues registered certificates which represent undivided interests in a specified pool of mortgages guaranteed by GNMA, as well as by the Veterans' Administration, the Federal Housing Administration, or the Farmers Home Administration. These certificates are referred to in the market as "Ginnie Maes."

The Federal Home Loan Mortgage Corporation (FHLMC) is a corporation whose capital stock is owned by the Federal Home Loan Bank Board and whose directors are appointed by the President with the advice and consent of the Senate. The directors of the Federal Home Loan Bank Board act as the directors of FHLMC.

FHLMC also sells mortgage certificates which are known as participation certificates and which are referred to in the market as "Freddie Macs." Each of these certificates represents an undivided fractional interest in a pool of conventional (non-VA and non-FHA) mortgages.

Each prospective investor,[6] including petitioners herein, was given a disclosure memorandum by GIM in which the investment strategy developed by Mr. Gregory was described as follows:

Gregory Investment assists investors in profiting from changes in yields on U.S. Government securities. The investor provides us with his forecast of interest rates. We recommend a portfolio of U.S. Government securities that we believe will result in a gain, if the investor's forecast is correct.

The investment usually involves the purchase and sale of securities under arrangements that delay the actual delivery of the security for several months. This type of arrangement is referred to as a forward contract.

A forward contract is a bilateral executory agreement pursuant to which one party agrees to deliver a designated amount of an item at a certain price and time to another party, who agrees to acquire such item at such price and time. The forward contract does not require delivery until the settlement date designated in the contract. A forward contract is similar in concept to a futures contract. However, a futures contract is consummated through a board of trade or an exchange and contains standardized terms and conditions. The securities purchases and sales through forward contracts are limited to obligations of, or obligations guaranteed by, the United States Government, and securities issued by or guaranteed by United States Government corporations or agencies; e.g., Government National Mortgage Association (GNMA) or Federal Home Loan Mortgage Corporation (FHLMC). The customer is required by the contract to make delivery to, or take delivery from, the dealer of the security specified in the forward contract at settlement date.

It is contemplated that a customer will enter into several forward contracts with the dealer, some of which will require the customer to make forward delivery to the dealer of securities, while others will require the customer to take forward delivery from the dealer of securities. The forward contracts entered into by a particular customer will reflect a market strategy and interest rate forecast and could result in substantial gain or loss to the customer, depending on the volume of transactions and whether interest rate movement is in accordance with, or adverse to, his expectations.

The investment risk is diminished by the simultaneous purchase and sale of a forward contract. This purchase and sale is called a spread. The profit and loss potential of a spread results from the purchase of securities and the sale of securities with different coupon interest rates.

A change in interest rates affects the price of a low-coupon security a greater percentage than a high-coupon security. However, the low-coupon

---

[6]At trial and on brief, petitioners contended that evidence of transactions between Mr. Gregory, GGS, or GIM and any investor other than petitioners is not relevant to the issues under consideration and therefore should not be admitted. After due consideration, we affirm the temporary decision made at the trial that such evidence is admissible in order to determine whether the transactions with petitioners are bona fide.

security costs less, so even though its price varies at a greater percentage rate, the total change in price is less.

The usual investment strategy to profit from rising interest rates is to *purchase low-coupon* and *sell high-coupon* securities. An opposite strategy would be used for a projected decline in interest rates.

For example—

Assume a 9% current yield to maturity on a security paying interest semi-annually and maturing in ten years. The investor forecasts interest rates to rise to 10%. This spread results in a profit:

|  | Coupon rate | Face value | 9-Percent yield | 10-Percent yield | Profit (loss) |
|---|---|---|---|---|---|
| Purchase (long) | 8% | $1,000,000 | $935,000 | $875,400 | $(59,600) |
| Sell (short) | 9 | 1,000,000 | 1,000,000 | 937,700 | 62,300 |
|  |  |  |  |  | 2,700 |

The column header "Price" spans the 9-Percent yield and 10-Percent yield columns.

The profit would be reduced by transaction costs.

\*  \*  \*  \*  \*  \*  \*

In the event a customer desires to be released from obligations under a particular forward contract, the customer may attempt to arrange for the cancellation of the obligations under the contract prior to settlement date. If the dealer agrees to cancel the contract, it will charge or credit the customer's account with an amount equal to the profit or loss that the customer is entitled to receive. In consideration for the release of the customer from his obligation to perform the contract the customer will also pay a fee to the dealer for risk and administrative costs created by the cancellation of the contract.

Alternatively, if the customer does not desire to be released from the obligations under a particular forward contract (original contract), but wants to eliminate the risk created by such contract, he may enter into a forward contract bearing the position opposite that of the original contract. The customer may request that the dealer offset the newly acquired contract against the original contract or he may keep both positions open and either offset at a later date or close out the position in some other manner.

The tax and economic results of various types of transactions are summarized below. The federal income tax results should be discussed with your tax advisor and you should not rely on the chart. The results could be challenged for various reasons by the Internal Revenue Service, as explained in the tax aspects section of this memorandum.

| TRANSACTION | FEDERAL INCOME TAX RESULTS | ECONOMIC RESULTS |
|---|---|---|
| Delivery of securities | Long position: none until securities are sold.<br><br>Short position: short-term capital gain or loss | Gain or loss is realized. Additional margin may be *required because of in-*creased risk unless a spread is re-established or all positions are closed. |
| Sale or assignment | Long-term capital gain or loss on contracts held over 1 year. Short-term 1 year or less. | |
| Cancellation | Ordinary gain or loss. | |
| Offset or pair-off of identical contract | Short-term capital gain or loss on all short positions and on all long positions held for 1 year or less on date of short sale. | |
| Opposing purchase or sale of securities identical to open positions | None | Establishes no risk situation locking in gain or loss for later realization. |
| Opposing purchase or sale of securities different from open positions | None | Establishes spread with potential for gain or loss. |

The memorandum stated that the forward contracts were not listed on any security or commodity exchange; that each contract was between the investor as one party and GGS as the other; that the investor could not sell or assign his interest in any contract without the consent of GGS; that if the investor wished to be released from the obligations of a particular forward contract before its settlement date, he had the right to request that GGS cancel the contract; and that if GGS agreed to do so, the investor's account would be credited by GGS with an amount equal to any profit the investor was entitled to receive or charged with any loss he had suffered on the contract plus a fee for the "risk and administrative costs created by the cancellation of the contract."

The memorandum also stated that each investor was required to have on deposit with GGS a sufficient amount to cover his investment risk which amount would vary with the size of the portfolio and the risk involved but the initial deposit would be a minimum of $10,000 or 0.125 percent of the face value of the portfolio, whichever was greater. An advisory fee of 0.001 percent per month was to be paid out of the deposit with GGS to GIM. In addition, an origination fee of 0.04 percent of the contract's face value was payable on the trade date, and the

fee for the cancellation of a contract was stated to be 0.02 percent of the face value on the cancellation date. GGS could also include a markup or a discount on any security covered by a contract.

Potential investors were warned by the disclosure memorandum that they could lose all of their deposit in a relatively short period of time and that in order to achieve a profit, the market would have to move in the direction forecast and by an amount that covered all fees plus or minus any markup or discount.

GIM's disclosure memorandum contained 14 pages, 4 of which were devoted to the tax treatment that Mr. Gregory thought an investor could expect as a result of entering into a transaction with GGS and GIM. Briefly, the transaction would proceed as follows: (1) The investor would make his deposit and furnish GIM with an interest rate forecast for the next 3, 12, and 15 months. (2) Using the interest forecast GIM, acting as an investment adviser, would prepare a portfolio of forward contracts on Ginnie Maes and Freddie Macs in the face amount required by the deposit and which, if the investor's prediction proved to be correct, would supposedly result in a profit. (3) Each of the forward contracts was entered into by the investor with GGS. In each case, the original portfolio for an investor constituted a spread or straddle since 50 percent of the contracts were long positions (contracts to purchase securities) and 50 percent were short positions (contracts to deliver securities). (4) As time passed and it became apparent which leg of the straddle would result in a loss,[7] that leg would be canceled and the gain in the other leg of the straddle would be locked in by entering into an offsetting or opposing contract to purchase or sell until such time as the investor wished to realize his gain (presumably after it became a long-term capital gain).

According to GIM's memorandum, the tax result of the above transaction would be an ordinary loss for the investor in the year of the cancellation of the loss contracts and a long-term capital gain in the year the gain was realized by the sale or assignment of the gain contracts. The memorandum, however, did contain the following caveat:

---

[7] Everything else being equal, any significant change either up or down in the prevailing interest rate would result in a gain in one leg and a loss in the other.

Due to the tax deferral and conversion of tax characteristics (i.e., capital versus ordinary) involved in the transactions described in this memorandum, the Service may take a strong stance contrary to the opinions expressed herein. Additional legislative action or Service rulings or regulations could also be enacted or issued negating any tax benefits that would otherwise be available to the investor as discussed in this memorandum. Further, if a court should feel that tax deferral or conversion is involved, it might be inclined to hold in favor of the Service, even though the opinions expressed in this memorandum are technically correct. The investor should review the tax treatment of the transactions discussed in this memorandum with his tax advisor and rely only upon the advice of his own tax advisor. The opinions expressed herein are only for purposes of providing information and analysis to the investor and his tax advisor.

Attached to the disclosure memorandum is a copy of the Service's Rev. Rul. 77–185, 1977–1 C.B. 48, 50. This ruling holds that "Neither a short-term capital loss created to minimize the tax consequences of an unrelated short-term capital gain through a series of transactions in silver futures contracts, which result in no real economic loss, nor the related out-of-pocket expenses incurred in connection with creating the loss are deductible under section 165(a) of the Code."

In spite of the caveat, prospective investors were advised that with a minimum deposit of $10,000 they could obtain forward contracts with GGS having a total face value of $8 million. They were also advised that for the minimum deposit, one or the other of the long or short positions (depending on the direction of the movement in the interest rate) would result in an ordinary loss in the approximate amount of 10 times the deposit or $100,000.

Each investor was required to sign a client or customer agreement which provided, among other things, that whenever GGS "considered it necessary for [its] protection," GGS could liquidate any open position or cancel any order through public or private action with or without notice to the investor; and in the event of death or incapacity of an investor, GGS could take any step it deemed appropriate to cancel or complete any open position. A power of attorney was also obtained from every investor. Under the power of attorney, GGS was authorized to follow the investment instructions of GIM in every respect, and GIM was authorized to act for the investor and perform in his behalf any act which he could perform in person. The power of

investor "ratif[ied] and confirm[ed] any and all transactions with [GGS] heretofore or hereafter made by [GIM] or for [his] account."

Even though GGS was a party to each of the forward contracts entered into by petitioners and had the right to include a markup or discount in any transaction, Mr. Gregory and David Solberg, the vice president and later president of GGS, admitted that neither GGS nor GIM made any profit from the contracts. Instead, their profits were generated from the advisory, origination, cancellation, and other fees.

GGS was required by the deputy corporation commissioner for the State of Oregon to establish and maintain a hedging program in publicly traded Ginnie Maes to insure its performance on forward contracts. GGS supposedly satisfied this requirement by hedging its net exposure on the total of its forward contracts by an offset with publicly traded Ginnie Maes.[8]

Under the client agreement, GGS had the authority to determine any price required under the contracts including cancellation prices. In order to arrive at a price, GGS purportedly used an elaborate formula consisting of approximately 20 steps. The first step was the receipt of a quotation in the open market for the then-current 8-percent Ginnie Maes. This price was then converted to a yield stated as a percentage which was used in computing a comparable value for the security being priced. The formula contained several other adjustments to be made in arriving at a price for a contract. Surprisingly enough, these included a step which allowed GGS to make any adjustment it felt was appropriate. At trial, Mr. Gregory admitted that on more than one occasion price concessions had been made to an investor if he felt that the investor's pricing expectations would be "disappointed" by adhering too strictly to market quotations or pricing formulas.

---

[8]GIM's disclosure memorandum contains the following provision on the risk of non-performance:

"Government Securities' [GGS's] ability to perform its obligation on settlement date will depend on the financial condition of Government Securities. Government Securities attempts to limit its economic risk by hedging its forward contract positions with either offsetting sales to or purchases from other customers. To the extent that Government Securities may have an imbalance between its long and its short positions (i.e., its net exposure), it will attempt to minimize that risk with offsetting purchases or sales of GNMA securities or GNMA futures contracts."

Following generally the procedure outlined in GIM's disclosure memorandum, petitioners and all other investors in the program made their respective deposits and furnished their interest forecasts to GIM and, in return, received documents which indicated their entry into forward contracts with GGS to purchase and sell Ginnie Maes and Freddie Macs. The documents included copies of the interest forecasts, forward contracts, powers of attorney, and client agreements referred to in the memorandum. The documents consisted of standard preprinted forms provided by GIM, and no negotiation or alterations by the investors was permitted as to their terms except with respect to the interest forecasts. The forms were executed by the investors or were executed for them by GIM pursuant to the powers of attorney. For the most part, investors in the Gregory program first became aware of the terms of their contracts when they received the copies from GGS.

The interest rate forecasts made by petitioners for 1979 were as follows:

|  | Brown | Sochin | Morgan | Leinbach |
|---|---|---|---|---|
| Date of forecast | 10/03/79 | 09/18/79 | 09/28/79 | 10/03/79 |
| Current rate | 10.9 | 10.586 | 10.8 | 10.915 |
| 3 Months | up 40 | up 50 | up 40 | up 40 |
| 12 Months | down 100 | down 90 | down 100 | up 100 |
| 15 Months | down 150 | down 100 | down 150 | down 100 |

For illustration purposes, Brown's forecast which was made on October 3, 1979, was to the effect that the 10.9-percent rate at which 8-percent Ginnie Maes were then trading on the Chicago Board of Trade would increase in 3 months by 40 basis points (0.04 percent), decrease in 12 months by 100 basis points (0.1 percent), and decrease in 15 months by 150 basis points (0.15 percent). Each of the other forecasts can be interpreted in a similar manner.

Each petitioner gave his 1979 forecast to GIM together with his 1979 deposit and, shortly thereafter, was furnished by GGS with a portfolio containing the forward contracts recommended by GIM, which according to GIM and GGS, would generate for petitioner a tax deduction of approximately $10 for each $1 of his deposit plus a gain if petitioner's interest forecast proved to be accurate.

Brown's account number with GGS was 135 and, according to the records of GGS, a transcript of the activity in the account

with respect to the 1979 investment is as shown in the table on page 980.

The above transcript of Brown's account purportedly indicates that in return for his $10,000 deposit the initial portfolio recommended by GIM for him contained forward contracts 1 to 7 (all dated October 4, 1979) of which the first three represented agreements by Brown to buy Ginnie Maes from GGS having a total value of $4 million, and the last four of which represented agreements by Brown to sell to GGS Freddie Macs having a total value of $4 million. Six days later, on October 10, 1979, the contracts to buy Ginnie Maes (1 to 3) were canceled by GGS at an ordinary loss for Brown of $100,160[9] and the $4 million in Freddie Macs included in the remaining sell contracts (4 to 7) were offset by contract number 8 to buy Freddie Macs from GGS in the amount of $4 million. On October 26, 1979, Brown's position in the buy and sell contracts of 4 to 8 were locked down by the contracts of 9 to 13.

On January 22, 1981, both the contracts to buy and the contracts to sell Freddie Macs (4 to 13) were disposed of at a net long-term capital gain to Brown of $106,382 by an assignment to RST Investment Co. (RST), a partnership. RST was an investor with GGS and GIM and its members were business associates of Mr. Gregory. The assignment was executed for Brown by GIM under his power of attorney.

Sochin was a one-sixth participant in GGS's account number 112 which was in the name of Harsh Associates. GGS's transcript of the activity in the account with respect to the 1979 investment is as shown in table on page 981.

The transcript of the Harsh Associates account, in which Sochin was a one-sixth participant, purportedly indicates that for a deposit of $12,000 Harsh Associates received an initial portfolio containing forward contracts 1 to 7 (all dated September 18, 1979) of which the first three represented agreements by Harsh to buy from GGS Ginnie Maes having a total value of $4,800,000 and the last four represented agreements by Harsh to sell to GGS Freddie Macs having a total value of $4,800,000. Sixteen days later, on October 4, 1979, the contracts to buy Ginnie Maes were canceled and the contracts to sell $4,800,000 in Freddie Macs as represented by contracts 4 to 7 were offset

---

[9]The record does not contain an explanation for the difference between this figure and the figures used on the return and the statutory notice, both of which reflect a loss of $106,160.

1979

## DENNIS S. BROWN

### GREGORY GOVERNMENT SECURITIES ACCOUNT NUMBER 135

| Contract number | DSB buy/sell | Amount | Type | Trade date | Percent | Settle date | Settle price | Disposition date | Disposition price | Gain/(loss) | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Buy | 2.0 | GNMA | 10/04/79 | 7.5 | 3/10/81 | 78.464 | C | 10/10/79 | 76.003 | ($49,220) |
| 2 | Buy | 1.0 | GNMA | 10/04/79 | 8.25 | 3/01/81 | 82.546 | C | 10/10/79 | 80.010 | (25,360) |
| 3 | Buy | 1.0 | GNMA | 10/04/79 | 9.0 | 3/30/81 | 84.943 | C | 10/10/79 | 82.385 | (25,580) | ($100,160) |
| 4 | Sell | 1.0 | FHLMC | 10/04/79 | 8.75 | 3/15/81 | 84.025 | A | 1/22/81 | 76.7572 | 72,678 |
| 5 | Sell | 1.0 | FHLMC | 10/04/79 | 9.0 | 4/01/81 | 84.443 | A | 1/22/81 | 77.1969 | 72,461 |
| 6 | Sell | 1.0 | FHLMC | 10/04/79 | 9.25 | 2/15/81 | 85.416 | A | 1/22/81 | 78.1425 | 72,735 |
| 7 | Sell | 1.0 | FHLMC | 10/04/79 | 9.5 | 3/01/81 | 86.365 | A | 1/22/81 | 79.0841 | 72,809 |
| 8 | Buy | 4.0 | FHLMC | 10/10/79 | 8.0 | 4/15/81 | 78.500 | A | 1/22/81 | 73.8769 | (184,924) |
| 9 | Sell | 4.0 | FHLMC | 10/26/79 | 8.0 | 5/15/81 | 74.9974 | A | 1/22/81 | 73.8769 | 44,820 |
| 10 | Buy | 1.0 | FHLMC | 10/26/79 | 8.75 | 4/15/81 | 77.8633 | A | 1/22/81 | 76.7572 | (11,061) |
| 11 | Buy | 1.0 | FHLMC | 10/26/79 | 9.0 | 5/01/81 | 78.3042 | A | 1/22/81 | 77.1969 | (11,073) |
| 12 | Buy | 1.0 | FHLMC | 10/26/79 | 9.25 | 3/15/81 | 79.2472 | A | 1/22/81 | 78.1425 | (11,047) |
| 13 | Buy | 1.0 | FHLMC | 10/26/79 | 9.5 | 4/01/81 | 80.1857 | A | 1/22/81 | 79.0841 | (11,016) |

A net gain = 106,382

C + A net, net gain   6,222

Fees   (6,100)

Net profit to client   122

1979

## HARSH ASSOCIATES
(James E. Sochin (1/6))

GREGORY GOVERNMENT SECURITIES ACCOUNT NUMBER 112

| Contract number | JES buy/sell | Amount | Type | Trade date | Percent | Settle date | Settle price | Disposition date | Disposition price | Gain/(loss) (JES share) | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Buy | 2.4 | GNMA | 9/18/79 | 7.5 | 3/10/81 | 80.515 | C 10/04/79 | 78.056 | ($9,836) | |
| 2 | Buy | 1.2 | GNMA | 9/18/79 | 8.25 | 3/01/81 | 85.231 | C 10/04/79 | 82.662 | (5,138) | |
| 3 | Buy | 1.2 | GNMA | 9/18/79 | 9.0 | 3/30/81 | 87.047 | C 10/04/79 | 84.494 | (5,106) | ($20,080) |
| 4 | Sell | 1.2 | FHLMC | 9/18/79 | 8.75 | 3/15/81 | 86.140 | A 12/17/80 | 76.4849 | 19,302 | |
| 5 | Sell | 1.2 | FHLMC | 9/18/79 | 9.0 | 4/01/81 | 86.547 | A 12/17/80 | 76.9291 | 19,236 | |
| 6 | Sell | 1.2 | FHLMC | 9/18/79 | 9.25 | 2/15/81 | 87.531 | A 12/17/80 | 77.8741 | 19,314 | |
| 7 | Sell | 1.2 | FHLMC | 9/18/79 | 9.5 | 3/01/81 | 86.513 | A 12/17/80 | 78.8149 | 19,396 | |
| 8 | Buy | 4.8 | FHLMC | 10/04/79 | 8.0 | 4/15/81 | 80.563 | A 12/17/80 | 73.6124 | (55,605) | |
| 9 | Buy | 1.2 | FHLMC | 10/23/79 | 8.75 | 4/15/81 | 76.704 | A 12/17/80 | 76.4889 | (430) | |
| 10 | Buy | 1.2 | FHLMC | 10/23/79 | 9.0 | 5/01/81 | 77.1499 | A 12/17/80 | 76.9291 | (442) | |
| 11 | Buy | 1.2 | FHLMC | 10/23/79 | 9.25 | 3/15/81 | 78.087 | A 12/17/80 | 77.8741 | (426) | |
| 12 | Buy | 1.2 | FHLMC | 10/23/79 | 9.5 | 4/01/81 | 79.0193 | A 12/17/80 | 78.8149 | (409) | |
| 13 | Sell | 4.8 | FHLMC | 10/23/79 | 8.0 | 5/15/81 | 73.8655 | A 12/17/80 | 73.6124 | 2,025 | |

A net gain = 21,961

C + A net, net gain 1,881

Fees (1,420)

Net profit to client 461

by a contract to buy from GGS Freddie Macs in the amount of $4,800,000. On October 23, 1979, Harsh Associates' positions in the buy and sell contracts 4 to 8 were locked down by contract numbers 9 to 13. For his proportionate deposit of $2,000 Sochin claimed an ordinary loss from the October 4 cancellation in the amount of $20,080.[10]

On February 12, 1981, both the contracts to buy and the contracts to sell Freddie Macs (4 to 13) were purportedly disposed of at a net long-term capital gain to Sochin of $21,961 by an assignment to RST. The assignment was executed for Sochin and the other members of Harsh Associates by GIM under its power of attorney.

Morgan was one of six participants in GGS's account number 127. His interest in the account, however, was 31.43 percent. The account was in the name of RMC Associates. The transcript of account number 127 reflects the activity shown in the table on page 983 with respect to the 1979 investment.

The transcript of RMC Associates' account purportedly indicates that for their $70,000 deposit they received an initial portfolio containing forward contracts 1 to 7 (all dated September 28, 1979), of which the first three represented agreements by them to buy from GGS Ginnie Maes having a total value of $28 million, and the last four represented agreements by them to sell to GGS Freddie Macs having a total value of $28 million. Eleven days later, on October 9, 1979, the contracts to buy Ginnie Maes were canceled by GGS and the $28 million in Freddie Macs which were included in sell contracts 4 to 7 were offset by contract 8 to buy from GGS Freddie Macs having a total value of $28 million. On October 22, 1979, RMC Associates' position in contracts 4 to 8 to buy and sell Freddie Macs was locked down by contracts 9 to 13. For his proportionate deposit of $22,000, Morgan claimed an ordinary loss from the October 9 cancellation in the amount of $219,340.[11]

On February 12, 1981, both the contracts to buy and the contracts to sell the Freddie Macs (4 to 13) were all purportedly disposed of at a net long-term capital gain to Morgan of $234,732 by an assignment to RST. The assignment was

---

[10]The record does not contain an explanation for the difference between this figure and the figures used on the return and the statutory notice, both of which reflect a loss of $20,621.

[11]The record does not contain an explanation for the difference between this figure and the figures used on the return and the statutory notice, both of which reflect a loss of $224,416.

1979

RMC ASSOCIATES

(Ellison C. Morgan (31.43 percent))

GREGORY GOVERNMENT SECURITIES ACCOUNT NUMBER 127

| Contract number | ECM buy/sell | Amount | Type | Trade date | Percent | Settle date | Settle price | Disposition date | Disposition price | Gain/(loss) (ECM share) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Buy | 14.0 | GNMA | 9/28/79 | 7.5 | 3/10/81 | 79.169 | C 10/09/79 | 76.729 | ($107,360) |
| 2 | Buy | 7.0 | GNMA | 9/28/79 | 8.25 | 3/01/81 | 83.281 | C 10/09/79 | 80.744 | (55,814) |
| 3 | Buy | 7.0 | GNMA | 9/28/79 | 9.0 | 3/30/81 | 86.678 | C 10/09/79 | 83.125 | (56,166) |
| 4 | Sell | 7.0 | FHLMC | 9/28/79 | 8.75 | 3/15/81 | 84.763 | A 2/12/81 | 72.6893 | 265,621 |
| 5 | Sell | 7.0 | FHLMC | 9/28/79 | 9.0 | 4/01/81 | 85.178 | A 2/12/81 | 73.1436 | 264,757 |
| 6 | Sell | 7.0 | FHLMC | 9/28/79 | 9.25 | 2/15/81 | 86.156 | A 2/12/81 | 74.0681 | 265,934 |
| 7 | Sell | 7.0 | FHLMC | 9/28/79 | 9.5 | 3/01/81 | 87.125 | A 2/12/81 | 74.9890 | 266,992 |
| 8 | Buy | 28.0 | FHLMC | 10/09/79 | 8.0 | 4/15/81 | 79.219 | A 2/12/81 | 69.9127 | (818,954) |
| 9 | Buy | 7.0 | FHLMC | 10/22/79 | 8.75 | 4/15/81 | 78.2804 | A 2/12/81 | 72.6893 | (123,004) |
| 10 | Buy | 7.0 | FHLMC | 10/22/79 | 9.0 | 5/01/81 | 78.7205 | A 2/12/81 | 73.1436 | (122,692) |
| 11 | Buy | 7.0 | FHLMC | 10/22/79 | 9.25 | 3/15/81 | 79.6658 | A 2/12/81 | 74.0681 | (123,149) |
| 12 | Buy | 7.0 | FHLMC | 10/22/79 | 9.5 | 4/01/81 | 80.6065 | A 2/12/81 | 74.3830 | (123,585) |
| 13 | Sell | 28.0 | FHLMC | 10/22/79 | 8.0 | 5/15/81 | 75.3992 | A 2/12/81 | 69.9127 | 482,812 |

C net gain = ($219,340)

A net gain = 234,732

C + A net, net gain 15,392

Fees (11,031)

Net profit to client 4,361

executed for Morgan and the other members of RMC Associates by GIM under his power of attorney.

Leinbach's account number with GGS was 137 and the transcript of the activity in his account with respect to the 1979 investment is as shown in the table on page 985.

The transcript of Leinbach's account purportedly indicates that for his deposit of $20,000 he received an initial portfolio containing forward contracts 1 to 7 (all dated October 4, 1979), of which the first three represented agreements by him to buy from GGS Ginnie Maes having a total value of $8 million, and the last four represented agreements by him to sell to GGS Freddie Macs having a total value of $8 million. Fifteen days later, on October 19, 1979, the contracts to buy Ginnie Maes were canceled by GGS at an ordinary loss for Leinbach of $389,876[12] and the contracts to sell Freddie Macs were offset by contract number 8 to buy from GGS Freddie Macs in the total amount of $8 million. On October 26, 1979, his position in the Freddie Macs were locked down by agreements to sell and to buy Freddie Macs in the amount of $8 million. On January 27, 1981, all of the Freddie Mac contracts were disposed of at a net long-term capital gain to Leinbach of $403,148 by assignment to RST. The assignment was executed for Leinbach by GIM under his power of attorney.

Brown did not participate in the program after 1979, and Morgan did not participate in the program after 1980. Transcripts of Sochin's and Leinbach's accounts for the years 1980 and 1981 as well as a transcript of Morgan's account for 1980 are set out in the tables on pages 986–992.

The deposits made by Brown, Sochin (through Harsh Associates), Morgan (through RMC Associates), and Leinbach during 1979 were refunded to them before the end of 1979. The first 49 participants in the Gregory program generally were accorded the same treatment as these petitioners. In other words, in spite of any inconsistency in their interest forecasts, these first participants each received a portfolio of contracts (many of which contained the same contracts as the portfolios received by other participants); shortly after receipt, the loss leg of each of their contract portfolios was canceled, generating the putative losses in issue; their deposits were refunded in

---

[12]The record does not contain an explanation for the difference between this figure and the figures used on the return and the statutory notice, both of which reflect a loss of $394,676.

1979

JAMES N. LEINBACH AND MARY ALICE LEINBACH

GREGORY GOVERNMENT SECURITIES ACCOUNT NUMBER 137

| Contract number | JNL buy/sell | Amount | Type | Trade date | Percent | Settle date | Settle price | Disposition date | | Disposition price | Gain/(loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Buy | 4.0 | GNMA | 10/04/79 | 7.5 | 3/10/81 | 78.464 | C | 10/19/79 | 73.6881 | ($191,036) |
| 2 | Buy | 2.0 | GNMA | 10/04/79 | 8.25 | 3/01/81 | 82.546 | C | 10/19/79 | 77.5936 | (99,040) |
| 3 | Buy | 2.0 | GNMA | 10/04/79 | 9.0 | 3/30/81 | 84.943 | C | 10/19/79 | 79.9534 | (99,792) |
| 4 | Sell | 2.0 | FHLMC | 10/04/79 | 8.75 | 3/15/81 | 84.025 | A | 1/27/81 | 76.9008 | 142,484 |
| 5 | Sell | 2.0 | FHLMC | 10/04/79 | 9.0 | 4/01/81 | 84.443 | A | 1/27/81 | 77.3399 | 142,062 |
| 6 | Sell | 2.0 | FHLMC | 10/04/79 | 9.25 | 2/15/81 | 85.416 | A | 1/27/81 | 78.2864 | 142,592 |
| 7 | Sell | 2.0 | FHLMC | 10/04/79 | 9.5 | 3/01/81 | 86.365 | A | 1/27/81 | 79.2286 | 142,728 |
| 8 | Buy | 8.0 | FHLMC | 10/19/79 | 8.0 | 4/15/81 | 76.1202 | A | 1/27/81 | 74.0168 | (168,272) |
| 9 | Sell | 8.0 | FHLMC | 10/26/79 | 8.0 | 5/15/81 | 74.9974 | A | 1/27/81 | 74.0168 | 78,448 |
| 10 | Buy | 2.0 | FHLMC | 10/26/79 | 8.75 | 4/15/81 | 77.8633 | A | 1/27/81 | 76.9008 | (19,250) |
| 11 | Buy | 2.0 | FHLMC | 10/26/79 | 9.0 | 5/01/81 | 78.3042 | A | 1/27/81 | 77.3399 | (19,286) |
| 12 | Buy | 2.0 | FHLMC | 10/26/79 | 9.25 | 3/15/81 | 79.2472 | A | 1/27/81 | 78.2864 | (19,216) |
| 13 | Buy | 2.0 | FHLMC | 10/26/79 | 9.5 | 4/01/81 | 80.1857 | A | 1/27/81 | 79.2286 | (19,142) |

($389,876)

A net gain = 403,148

C + A net, net gain 13,272

Fees (12,660)

Net profit to client 612

1980

## JAMES E. SOCHIN

GREGORY GOVERNMENT SECURITIES ACCOUNT NUMBERS 475 AND 476

| Contract number | JES buy/sell | Amount | Type | Trade date | Percent | Settle date | Settle price | Disposition date | | Disposition price | Gain/(loss) (JES share) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 14 | Buy | 8.0 | GNMA | 6/17/80 | 9.25 | 3/15/82 | 91.8723 | A | 1/26/82 | 67.7112 | ($193,289) |
| 15 | Sell | 8.0 | FHLMC | 6/17/80 | 8.00 | 4/15/82 | 85.2462 | C | 6/20/80 | 86.5457 | (10,396) |
| 16 | Sell | 8.0 | FHLMC | 6/20/80 | 9.25 | 2/15/82 | 91.7037 | A | 1/26/82 | 66.2112 | 203,940 |
| 17 | Sell | 4.0 | FHLMC | 6/20/80 | 10.00 | 4/01/82 | 95.2781 | A | 1/26/82 | 69.1602 | 104,472 |
| 18 | Sell | 4.0 | FHLMC | 6/20/80 | 10.25 | 4/01/82 | 96.5921 | A | 1/26/82 | 70.2305 | 105,446 |
| 19 | Buy | 4.0 | GNMA | 6/20/80 | 10.50 | 3/01/82 | 99.4663 | C | 6/23/80 | 98.2301 | (4,945) |
| 20 | Buy | 4.0 | GNMA | 6/20/80 | 11.25 | 3/01/82 | 103.3855 | C | 6/23/80 | 102.1184 | (5,068) |
| 21 | Buy | 4.0 | GNMA | 6/23/80 | 10.75 | 5/01/82 | 99.4664 | A | 1/26/82 | 73.8699 | (102,386) |
| 22 | Buy | 4.0 | GNMA | 6/23/80 | 11.00 | 5/01/82 | 100.7626 | A | 1/26/82 | 74.9386 | (103,296) |
| 23 | Buy | 4.0 | FFHLMC | 6/27/80 | 10.00 | 3/01/82 | 91.0065 | A | 1/26/82 | 69.1915 | (87,260) |
| 24 | Buy | 4.0 | FHLMC | 6/27/80 | 10.25 | 3/04/82 | 92.2827 | A | 1/26/82 | 78.2618 | (88,084) |
| 25 | Sell | 4.0 | GNMA | 6/27/80 | 10.75 | 4/01/82 | 96.3289 | A | 1/26/82 | 73.9011 | 89,711 |
| 26 | Sell | 4.0 | GNMA | 6/27/80 | 11.00 | 4/01/82 | 97.5986 | A | 1/26/82 | 74.9698 | 90,515 |

1980

JAMES K. SOCHIN—continued

GREGORY GOVERNMENT SECURITIES ACCOUNT NUMBERS 475 AND 476

| Contract number | JES buy/sell | Amount | Type | Trade date | Percent | Settle date | Settle price | Modified settle date | Modified settle price | Disposition date | Disposition price | Gain/(loss) (JES share) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 27 | Buy | 4.8 | GNMA | 6/18/80 | 9.25 | 3/15/82 | 91.1182 | N/A | N/A | C 6/25/80 | 90.5797 | ($5,385) |
| 28 | Sell | 4.8 | FHLMC | 6/18/80 | 8.00 | 4/15/82 | 84.5104 | 8/15/83 | 84.7710 | A 1/26/82 | 59.4013 | 253,696 |
| 29 | Buy | 4.8 | GNMA | 6/25/80 | 8.00 | 5/15/82 | 84.9850 | 9/15/83 | 85.2768 | A 1/26/82 | 60.4325 | (248,443) |
| 30 | Sell | 2.4 | FHLMC | 6/25/80 | 10.00 | 4/01/82 | 92.5946 | N/A | N/A | C 6/26/80 | 92.9634 | (1,844) |
| 31 | Sell | 2.4 | FHLMC | 6/25/80 | 10.25 | 4/01/82 | 93.8851 | N/A | N/A | C 6/26/80 | 94.2571 | (1,860) |
| 32 | Buy | 2.4 | GNMA | 6/25/80 | 10.50 | 3/01/82 | 96.7360 | 7/01/83 | 96.9953 | A 1/26/82 | 72.2121 | (123,916) |
| 33 | Buy | 2.4 | GNMA | 6/25/80 | 11.25 | 3/01/82 | 100.5866 | 7/01/83 | 100.8563 | A 1/26/82 | 75.9531 | (124,516) |
| 34 | Sell | 2.4 | FHLMC | 6/26/80 | 10.50 | 2/01/82 | 96.1113 | 6/01/83 | 96.3394 | A 1/26/82 | 71.1809 | 125,792 |
| 35 | Sell | 2.4 | FHLMC | 6/26/80 | 11.25 | 2/01/82 | 99.9714 | 6/01/83 | 100.2099 | A 1/26/82 | 74.9219 | 126,440 |
| 36 | Sell | 4.8 | FHLMC | 6/26/80 | 10.75 | 4/10/82 | 96.8381 | 8/10/83 | 97.1323 | A 1/26/82 | 71.9106 | 252,216 |
| 37 | Buy | 4.8 | GNMA | 6/26/80 | 11.50 | 3/10/82 | 102.2525 | N/A | N/A | C 6/27/80 | 100.5140 | (17,385) |
| 38 | Buy | 4.8 | GNMA | 6/27/80 | 10.75 | 5/10/82 | 96.1418 | 9/10/83 | 96.4672 | A 1/26/82 | 72.9418 | (235,254) |
| 39 | Sell | 4.8 | FHLMC | 6/27/80 | 11.00 | 4/20/82 | 96.4144 | 8/20/83 | 96.7120 | A 1/26/82 | 73.1434 | 235,685 |
| 40 | Buy | 4.8 | GNMA | 6/27/80 | 11.75 | 3/20/82 | 101.7782 | 7/20/83 | 102.0553 | A 1/26/82 | 78.4774 | (294,779) |
| 41 | Buy | 4.8 | GNMA | 6/30/80 | 11.00 | 5/20/82 | 96.2725 | 9/20/83 | 96.6013 | A 1/26/82 | 74.1746 | (224,267) |
| 42 | Sell | 4.8 | FHLMC | 6/30/80 | 11.75 | 2/20/82 | 99.6082 | 6/20/83 | 99.8541 | A 1/26/82 | 77.4462 | 224,079 |

A net gain = 45,502

C + A net (1,381)

Fees (3,092)

Net to client (4,473)

1981

JAMES E. SOCHIN

GREGORY GOVERNMENT SECURITIES ACCOUNT NUMBER 1293

| Contract number | JES buy/sell | Amount | Type | Trade date | Percent | Settle date | Settle price | Disposition date | Disposition price | Gain/(loss) (JES share) |
|---|---|---|---|---|---|---|---|---|---|---|
| 43 | Sell | 2.5 | FHLMC | 3/31/81 | 8.25 | 4/01/83 | 72.1670 | A 1/28/83 | 78.2089 | ($48,335) |
| 44 | Sell | 2.5 | FHLMC | 3/31/81 | 8.50 | 4/01/83 | 73.1076 | A 1/28/83 | 79.4524 | (50,758) |
| 45 | Buy | 2.5 | GNMA | 3/31/81 | 9.00 | 3/01/83 | 76.0284 | C 4/02/81 | 75.5986 | (3,438) |
| 46 | Buy | 2.5 | GNMA | 3/31/81 | 10.50 | 3/01/83 | 82.5329 | C 4/02/81 | 82.0815 | (3,611) |
| 47 | Buy | 2.5 | FHLMC | 4/02/81 | 8.25 | 5/01/83 | 72.2407 | A 1/28/83 | 78.7089 | 51,746 |
| 48 | Buy | 2.5 | FHLMC | 4/02/81 | 8.50 | 5/01/83 | 73.1787 | A 1/28/83 | 79.9524 | 54,189 |
| 49 | Buy | 2.5 | FHLMC | 4/08/81 | 9.00 | 3/01/83 | 73.2064 | P 4/09/81 | 73.6015 | 3,161 |
| 50 | Buy | 2.5 | FHLMC | 4/08/81 | 9.25 | 3/01/83 | 74.1241 | P 4/09/81 | 74.5214 | 3,179 |
| 51 | Sell | 2.5 | GNMA | 4/08/81 | 9.50 | 4/01/83 | 75.5695 | P 4/09/81 | 75.9691 | (3,197) |
| 52 | Sell | 2.5 | GNMA | 4/08/81 | 10.50 | 4/01/83 | 80.1516 | P 4/09/81 | 80.5668 | (3,322) |
| 53 | Sell | 2.5 | GNMA | 4/09/81 | 7.50 | 3/10/83 | 68.2401 | A 1/28/83 | 75.5144 | (58,194) |
| 54 | Sell | 1.25 | GNMA | 4/09/81 | 8.25 | 3/20/83 | 71.9577 | A 1/28/83 | 79.2401 | (29,130) |
| 55 | Sell | 1.25 | GNMA | 4/09/81 | 9.00 | 3/30/83 | 74.2777 | A 1/28/83 | 83.0259 | (34,993) |
| 56 | Buy | 1.25 | FHLMC | 4/09/81 | 8.75 | 3/15/83 | 73.2898 | C 4/10/81 | 72.2486 | (4,165) |
| 57 | Buy | 1.25 | FHLMC | 4/09/81 | 9.00 | 4/05/83 | 73.7465 | C 4/10/81 | 72.7088 | (4,151) |
| 58 | Buy | 1.25 | FHLMC | 4/09/81 | 9.25 | 2/15/83 | 74.6672 | C 4/10/81 | 73.6237 | (4,174) |
| 59 | Buy | 1.25 | FHLMC | 4/09/81 | 9.50 | 3/01/83 | 75.5843 | C 4/10/81 | 74.5350 | (4,197) |
| 60 | Buy | 2.5 | GNMA | 4/10/81 | 7.50 | 4/10/83 | 67.7494 | A 1/28/83 | 76.0144 | 66,120 |
| 61 | Buy | 1.25 | GNMA | 4/10/81 | 8.25 | 4/20/83 | 71.4289 | A 1/28/83 | 79.7401 | 33,245 |
| 62 | Buy | 1.25 | GNMA | 4/10/81 | 9.00 | 4/30/83 | 73.7400 | A 1/28/83 | 83.5259 | 39,143 |
| 63 | Buy | 5.0 | FHLMC | 4/10/81 | 8.00 | 4/08/83 | 69.0184 | A 1/28/83 | 77.4660 | 135,162 |
| 64 | Sell | 5.0 | GNMA | 4/10/81 | 9.25 | 3/08/83 | 74.1549 | C 4/13/81 | 75.0152 | (13,768) |
| 65 | Sell | 5.0 | FHLMC | 4/13/81 | 8.00 | 2/08/83 | 69.3536 | A 1/28/83 | 76.9660 | (121,798) |

A net gain = $36,397
C + A + P net (1,283)
Fees (2,739)
Net to client (4,022)

1980

## JAMES N. LEINBACH AND MARY ALICE LEINBACH

### GREGORY GOVERNMENT SECURITIES ACCOUNT NUMBER 137

| Contract number | JNL buy/sell | Amount | Type | Trade date | Percent | Settle date | Settle price | Disposition date | Disposition price | Gain/(loss) |
|---|---|---|---|---|---|---|---|---|---|---|
| 14 | Sell | 12.0 | FHLMC | 6/19/80 | 8.0 | 4/15/82 | 85.7763 | A 1/25/82 | 62.0353 | $2,848,920 |
| 15 | Buy | 12.0 | GNMA | 6/19/80 | 9.25 | 3/15/82 | 92.4154 | C 6/25/80 | 90.5797 | (220,284) |
| 16 | Buy | 12.0 | GNMA | 6/25/80 | 8.0 | 5/15/82 | 85.4850 | A 1/25/82 | 63.5353 | (2,633,964) |
| 17 | Sell | 6.0 | FHLMC | 6/25/80 | 10.0 | 4/01/82 | 92.5946 | C 6/26/80 | 93.2964 | (42,108) |
| 18 | Sell | 6.0 | FHLMC | 6/25/80 | 10.25 | 4/01/82 | 93.8851 | C 6/26/80 | 94.5931 | (42,480) |
| 19 | Buy | 6.0 | GNMA | 6/25/80 | 10.50 | 3/01/82 | 96.7360 | A 1/25/82 | 73.1644 | (1,414,296) |
| 20 | Buy | 6.0 | GNMA | 6/25/80 | 11.25 | 3/01/82 | 100.5866 | C 12/11/80 | 86.4730 | (169,363) |
|  |  |  |  |  |  |  |  | A 1/25/82 | 76.3791 | (1,161,960) |
| 21 | Sell | 6.0 | FHLMC | 6/26/80 | 9.50 | 2/01/82 | 90.7602 | A 1/25/82 | 67.3718 | 1,403,304 |
| 22 | Sell | 6.0 | FHLMC | 6/26/80 | 10.75 | 2/01/82 | 97.2423 | A 1/25/82 | 72.7368 | 1,470,330 |
| 23 | Sell | 6.0 | GNMA | 6/27/80 | 10.50 | 4/01/82 | 95.6225 | A 1/25/82 | 73.1331 | 1,349,364 |
| 24 | Sell | 6.0 | GNMA | 6/27/80 | 11.25 | 4/01/82 | 99.4456 | A 1/25/82 | 76.3478 | 1,385,868 |
| 25 | Buy | 6.0 | FHLMC | 6/27/80 | 9.50 | 3/01/82 | 88.9952 | A 1/25/82 | 67.3406 | (1,299,276) |
| 26 | Buy | 6.0 | FHLMC | 6/27/80 | 10.75 | 3/01/82 | 95.3994 | A 1/25/82 | 72.7056 | (1,361,628) |
| 27 | Buy | 1.2 | GNMA | 12/12/80 | 11.25 | 2/01/82 | 86.5043 | A 1/25/82 | 76.4103 | (121,128) |

A net gain = $465,534  
C + A net (8,701)  
Fees (20,380)  
Net to client (29,081)

### 1981
### JAMES N. LEINBACH AND MARY ALICE LEINBACH
GREGORY GOVERNMENT SECURITIES ACCOUNT NUMBER 137

| Contract number | JNL buy/sell | Amount | Type | Trade date | Percent | Settle date | Settle price | Disposition date | Disposition price | Gain/(loss) |
|---|---|---|---|---|---|---|---|---|---|---|
| 28 | Sell | 8.0 | FHLMC | 3/18/81 | 8.25 | 4/01/83 | 74.9370 | A 1/07/83 | 79.1865 | ($339,960) |
| 29 | Sell | 8.0 | FHLMC | 3/18/81 | 8.50 | 4/01/83 | 75.8937 | A 1/07/83 | 80.4400 | (363,704) |
| 30 | Buy | 8.0 | GNMA | 3/18/81 | 9.00 | 3/01/83 | 78.8198 | C 3/20/81 | 77.6006 | (97,536) |
| 31 | Buy | 8.0 | GNMA | 3/18/81 | 10.50 | 3/01/83 | 85.4630 | C 3/20/81 | 84.1835 | (102,360) |
| 32 | Buy | 8.0 | FHLMC | 3/20/81 | 8.25 | 5/01/83 | 74.2269 | A 1/07/83 | 79.6865 | 436,768 |
| 33 | Buy | 8.0 | FHLMC | 3/20/81 | 8.50 | 5/01/83 | 75.1765 | A 1/07/83 | 88.9400 | 461,080 |
| 34 | Buy | 8.0 | GNMA | 3/26/81 | 7.50 | 3/10/83 | 69.3202 | A 1/07/83 | 76.9090 | 607,104 |
| 35 | Buy | 4.0 | GNMA | 3/26/81 | 8.25 | 3/20/83 | 73.0601 | A 1/07/83 | 80.7177 | 306,304 |
| 36 | Buy | 4.0 | GNMA | 3/26/81 | 9.00 | 3/30/83 | 75.3850 | A 1/07/83 | 84.5343 | 365,972 |
| 37 | Sell | 4.0 | FHLMC | 3/26/81 | 8.75 | 3/15/83 | 73.3992 | C 3/30/81 | 73.8287 | (17,180) |
| 38 | Sell | 4.0 | FHLMC | 3/26/81 | 9.00 | 4/05/83 | 73.8538 | C 3/30/81 | 74.2818 | (17,120) |
| 39 | Sell | 4.0 | FHLMC | 3/26/81 | 9.25 | 2/15/88 | 74.7779 | C 3/30/81 | 75.2082 | (17,212) |
| 40 | Sell | 4.0 | FHLMC | 3/26/81 | 9.50 | 3/01/83 | 75.6984 | C 3/30/81 | 76.1311 | (17,308) |
| 41 | Sell | 8.0 | GNMA | 3/30/81 | 7.50 | 4/10/83 | 69.2290 | A 1/07/83 | 76.4090 | (574,400) |
| 42 | Sell | 4.0 | GNMA | 3/30/81 | 8.25 | 4/20/83 | 72.9846 | A 1/07/83 | 80.2177 | (289,324) |
| 43 | Sell | 4.0 | GNMA | 3/30/81 | 9.00 | 4/30/83 | 75.3130 | A 1/07/83 | 84.0343 | (348,852) |
| 44 | Buy | 8.0 | GNMA | 3/30/81 | 9.50 | 3/01/83 | 77.6285 | P 4/02/81 | 77.4455 | (14,640) |

991

1981

## JAMES N. LEINBACH AND MARY ALICE LEINBACH—continued

### GREGORY GOVERNMENT SECURITIES ACCOUNT NUMBER 137

| Contract number | JNL buy/sell | Amount | Type | Trade date | Percent | Settle date | Settle price | Disposition date | Disposition price | Gain/(loss) |
|---|---|---|---|---|---|---|---|---|---|---|
| 45 | Buy | 8.0 | GNMA | 3/30/81 | 10.50 | 3/01/83 | 82.2716 | P 4/02/81 | 82.0815 | ($15,208) |
| 46 | Sell | 8.0 | FHLMC | 3/30/81 | 9.00 | 4/01/83 | 74.2484 | P 4/02/81 | 74.0674 | 14,480 |
| 47 | Sell | 8.0 | FHLMC | 3/30/81 | 9.25 | 4/01/83 | 75.1747 | P 4/02/81 | 74.9926 | 14,568 |
| 48 | Buy | 8.0 | FHLMC | 4/08/81 | 9.00 | 3/01/83 | 73.2064 | P 4/09/81 | 73.6015 | 31,608 |
| 49 | Buy | 8.0 | FHLMC | 4/08/81 | 9.25 | 3/01/83 | 74.1241 | P 4/09/81 | 74.5214 | 31,784 |
| 50 | Sell | 8.0 | GNMA | 4/08/81 | 9.50 | 4/01/83 | 75.5695 | P 4/09/81 | 75.5691 | (31,968) |
| 51 | Sell | 8.0 | GNMA | 4/08/81 | 10.50 | 4/01/83 | 80.1516 | P 4/09/81 | 80.5668 | (33,216) |
| 52 | Sell | 16.0 | GNMA | 4/10/81 | 9.25 | 3/08/83 | 74.1549 | A 1/07/83 | 85.0065 | (1,736,256) |
| 53 | Buy | 16.0 | FHLMC | 4/10/81 | 8.00 | 4/08/83 | 69.0184 | C 4/13/81 | 68.2503 | (122,896) |
| 54 | Buy | 16.0 | GNMA | 4/13/81 | 9.25 | 2/04/83 | 73.8634 | A 1/07/83 | 85.5065 | 1,862,896 |
| 55 | Buy | 8.0 | FHLMC | 4/13/81 | 9.00 | 3/01/83 | 71.9218 | P 4/14/81 | 73.3502 | 114,272 |
| 56 | Buy | 8.0 | FHLMC | 4/13/81 | 9.25 | 3/01/83 | 72.8322 | P 4/14/81 | 74.2687 | 114,920 |
| 57 | Sell | 8.0 | GNMA | 4/13/81 | 9.50 | 4/01/83 | 74.2704 | P 4/14/81 | 75.7149 | (115,560) |
| 58 | Sell | 8.0 | GNMA | 4/13/81 | 10.50 | 4/01/83 | 78.8013 | P 4/14/81 | 80.3027 | (120,112) |

A net gain = $387,628

C + A + P net (13,056)

Fees (28,660)

Net to client (41,716)

1980

## ELLISON C. MORGAN

### GREGORY GOVERNMENT SECURITIES ACCOUNT NUMBER 127

| Contract number | ECM buy/sell | Amount | Type | Trade date | Percent | Settle date | Settle price | Disposition date | Disposition price | Gain/(loss) (ECM share) |
|---|---|---|---|---|---|---|---|---|---|---|
| 14 | Sell | 15.0 | FHLMC | 6/17/80 | 8.00 | 4/15/82 | 85.5625 | C 6/20/80 | 86.5457 | ($147,480) |
| 15 | Buy | 15.0 | GNMA | 6/17/80 | 9.25 | 3/15/82 | 92.1964 | A 2/08/82 | 65.2136 | (4,047,420) |
| 16 | Sell | 15.0 | FHLMC | 6/20/80 | 9.25 | 2/15/82 | 91.7037 | A 2/08/82 | 63.7136 | 4,198,515 |
| 17 | Sell | 7.5 | FHLMC | 6/20/80 | 10.00 | 4/01/82 | 95.2781 | A 2/08/82 | 66.9439 | 2,125,065 |
| 18 | Sell | 7.5 | FHLMC | 6/20/80 | 10.25 | 4/01/82 | 96.5921 | A 2/08/82 | 68.1494 | 2,133,202 |
| 19 | Buy | 7.5 | GNMA | 6/20/80 | 10.50 | 3/01/82 | 99.4663 | C 6/23/80 | 97.8938 | (117,937) |
| 20 | Buy | 7.5 | GNMA | 6/20/80 | 11.25 | 3/01/82 | 103.3855 | C 6/23/80 | 101.7737 | (120,885) |
| 21 | Buy | 7.5 | GNMA | 6/23/80 | 10.75 | 5/01/82 | 99.1273 | A 2/08/82 | 72.0709 | (2,029,230) |
| 22 | Buy | 7.5 | GNMA | 6/23/80 | 11.00 | 5/01/82 | 100.4206 | A 2/08/82 | 73.2864 | (2,035,065) |
| 23 | Buy | 7.5 | GNMA | 6/27/80 | 10.00 | 3/01/82 | 92.3731 | A 2/08/82 | 68.0064 | (1,827,502) |
| 24 | Buy | 7.5 | GNMA | 6/27/80 | 10.25 | 3/01/82 | 93.6522 | A 2/08/82 | 69.2119 | (1,833,022) |
| 25 | Sell | 7.5 | FHLMC | 6/27/80 | 10.75 | 4/01/82 | 95.6418 | A 2/08/82 | 71.0709 | 1,842,817 |
| 26 | Sell | 7.5 | FHLMC | 6/27/80 | 11.00 | 4/01/82 | 96.9144 | A 2/08/82 | 72.2864 | 1,847,100 |

A net gain = $374,460

C + A net (11,842)

Fees (13,900)

Net to client (25,742)

full; their gain legs (which were locked in) were carried on GGS' books for a period generally exceeding 16 months; and then their gain legs were assigned, which generated a credit to each participant's account that was set off against the loss (debit) generated by the earlier cancellation. Those participants who followed with GGS accounts numbered 150 and after were accorded the same treatment as the first participants except that they did not receive refunds of their deposits.[13] The refunds given by Gregory to the first 49 participants obviously served as some inducement to others to participate in his program.

All assignments made during 1980 and through November 1981 were to RST, a partnership whose members, Campbell Richardson, Stephen Shepard, and David Tangvald, were associates of Gregory. The assignments made thereafter were to Northwest Investment Group, Inc. (NIG), a Nevada corporation of which Patricia Buescher, a niece of Mr. Gregory and an employee of GGS, was the principal stockholder and officer. Lyle Adams, another employee of GGS, was also an officer of NIG. GGS mailed the assignment documents to NIG at a mail drop established by NIG in Nevada; the documents were forwarded from there to Adams at his Portland residence.

GGS paid RST and NIG $100 for each assignment without regard to the amount of the contract. The assignment fee in each case was charged to the participant's account. The contracts were subsequently reassigned by RST and NIG to GGS at the same price as that used in the original assignment by the participant. As a result, neither RST nor NIG realized any income from the acquisition or the disposition of the contracts. In this connection, their income was limited to the $100 fees paid by GGS and charged to the participants. Furthermore, both the assignments to RST and NIG, as well as the reassignments by them to GGS, were handled by offsetting accounting entries of receivables and payables. In other words, other than the assignment fees for $100, no funds were exchanged with respect to the contracts at any time between the participants and RST or NIG on the original assignment or between RST or NIG and GGS on the reassignments.

---

[13]In or about November of 1979, full refunds of deposits ceased.

After the reassignment of an investor's contracts by RST or NIG to GGS, the payable due from the investor as a result of the cancellation of his loss position was due to GGS. At the same time, the receivable in approximately the same amount due the investor as a result of the assignment of his gain position was due from GGS. At this point, the circle was completed and neither the investor, nor his assignee on the gain position (RST or NIG), nor GGS had realized any actual gain or loss on the contracts. The relatively minor net profits or net losses reflected by some of the transcripts of its accounts with petitioners were generated by GGS through "adjustments" to the cancellation prices and/or the assignment prices or, at times, by the failure of GGS to charge full transaction fees in accordance with the client agreements.

No Ginnie Maes or Freddie Macs were ever bought or sold with respect to any of the forward contracts to buy or sell such securities executed by GGS as one party, and executed by or for petitioners Brown, Sochin, Morgan, or Leinbach as the other party. In fact, the record does not contain any evidence that any Ginnie Maes or any Freddie Macs were ever bought, sold, accepted, or delivered under any forward contract executed by GGS with any investor during the years 1979, 1980, and 1981.[14] Instead, all loss positions were canceled before settlement dates and all gain positions were assigned to RST or NIG and reassigned to GGS before such dates. Apparently GGS also never had any inventory of either Ginnie Maes or Freddie Macs because, as Gregory testified, if GGS had ever been called upon for delivery it would have had to go into the market and try to make the necessary purchase.

In at least two instances, a Ginnie Mae described in and covered by one of the alleged forward contracts involved in this case was a rate (11.25 percent and 11.75 percent) at which no Ginnie Mae had ever been issued up to the date of trial.

The use of a cancellation to close, dispose of, or settle a forward contract is not a common practice by dealers in such contracts. For the most part, cancellations are used by such dealers only to correct errors.

Petitioner Dennis S. Brown is the sole stockholder and principal officer of an employment agency which he started in

---

[14]There is some evidence that a single such transaction was entered into with respect to litigation pending in another court after 1981.

1968. Prior to his investment in Gregory Government Securities, he had speculated in interest-rate futures offered by Merrill Lynch. He learned about Mr. Gregory from his accountant in October of 1979, and shortly thereafter attended a meeting with Mr. Gregory with his accountant and several other clients of his accountant.

On or about October 4, 1979, Mr. Brown deposited $10,000 with GGS. The deposit was refunded to him before the end of 1979. He was advised that before the end of 1979 he had realized an ordinary loss from GGS in the amount of $106,160 which he deducted on his 1979 return. He understood that in 1981 he had a long-term capital gain from the assignment of the remainder of his portfolio with GGS in the amount of $106,382 which he reported on his 1981 income tax return.

In 1979, 1980, and 1981, petitioner James E. Sochin was employed by Harsh Investment Corp. as a vice president in charge of its hotel operations division. He first heard about Mr. Gregory through Harold Schnitzer, who was the owner of Harsh Investment Corp. Through a meeting arranged by Mr. Schnitzer, Mr. Sochin attended a conference with Mr. Gregory in which he explained the portfolio structure and how interest rate movements affected security prices. After this meeting and on or about September 18, 1979, Mr. Sochin contributed $2,000 toward the total $12,000 deposited with GGS by Harsh Associates; Sochin and the other Harsh Associates received full refunds of their deposits before the end of 1979. He was later advised that he had an ordinary loss in 1979 of $20,621 which he reported on his 1979 income tax return. In 1980, he was advised that he had an ordinary loss on his GGS transactions in the amount of $48,054 and a long-term capital gain in the amount of $21,142, both of which he reported on his 1980 return. In 1981, he deducted an ordinary loss in the amount of $38,785 and reported a long-term capital gain in the amount of $44,804 from his GGS transactions.

At the time of trial, Ellison C. Morgan was 47 years of age. During 1979, 1980, and 1981, he was the president of Resource Management Consultants which designs and markets executive compensation plans, places loans for savings and loan associations, and through a separate company, designs and markets life insurance products through about 50 distributors. From about 1971 through about 1982, he invested regularly

and extensively in futures contracts. For example, during this period he bought, sold, and otherwise dealt in futures contracts in sugar, cattle, hopps, copper, corn, wheat, Deutsche marks, Swiss francs, bean oil, Canadian dollars, gold, treasury bills, and treasury bond. He had also dealt in Ginnie Maes and Freddie Macs.

Mr. Morgan first met Mr. Gregory while he was a partner with Arthur Andersen. They first met professionally when Mr. Gregory did some estate and financial planning for some of Mr. Morgan's clients and partners. Some time later in 1979, Mr. Morgan met on several different occasions with Mr. Gregory in order to learn about the promotion known as Gregory Government Securities. During these conversations and later conversations which he had with his own attorney, Mr. Morgan was made to understand that there was no guarantee against losses in case an investment was made in the program, and there was no guarantee of any gains. He did understand that an investment would result in a tax writeoff during the first year of approximately 10 to 1. He also understood that his initial deposit would be returned during the first year.

Mr. Morgan understood that he would simply furnish Mr. Gregory with an interest forecast and that Mr. Gregory would handle all of the necessary transactions through his two corporations. He was later advised that the transactions resulted in an ordinary loss during 1979 in the amount of $224,416, which he claimed on his 1979 income tax return. He also claimed a deduction for investment advice in the amount of $357. His deposit was also refunded to him before the end of 1979. In 1980, he was advised that he had an ordinary loss from his GGS transactions in the amount of $390,614 which he deducted on his 1980 return. On his 1981 income tax return, he reported a long-term capital gain from GGS transactions in the amount of $234,518, which he understood was the final result of his 1979 portfolio. He was later advised that he had a long-term capital gain in 1982 from his 1980 portfolio, but he did not report the 1982 gain because respondent in the meantime had audited his earlier returns and had disallowed the losses claimed therein.

Petitioner James N. Leinbach is a professional engineer, having received a composite degree in civil, electrical, and

mechanical engineering from the University of Portland in 1951. Upon receipt of his engineering degree, he went to work for a construction firm by the name of Slate-Hall as an assistant engineer. In 1961 he became a partner, and by 1979 he owned 50 percent of the firm which was then known as the Fred H. Slate Co. The company is primarily engaged in the construction of highways, but builds some dams. Prior to 1979, Mr. Leinbach had made personal investments in bonds, common stocks, and preferred stocks. Some of his investments were exempt from State income tax.

In or about September of 1979, Mr. Leinbach learned of the GGS program. Shortly thereafter, he and his accountant and his partner attended a meeting with Mr. Gregory. As a result of the meeting, Mr. Leinbach understood that the program involved mortgages secured by the Government and he also understood that there were a number of advantages including the possibility of a profit and a considerable tax loss in the first year.

In 1979, he made a deposit of $20,000 with GGS. The deposit was refunded to him before the end of the year. On his income tax return for 1979, Mr. Leinbach reported income in the amount of $427,681 from his partnership and deducted a loss in the amount of $394,376 on his GGS transactions. On his 1980 income tax return, Mr. Leinbach reported income from the partnership and other sources of $536,507 and deducted an ordinary loss from GGS transactions in the amount of $482,245. On his income tax return for 1981, Mr. Leinbach reported a long-term capital gain from the GGS transactions in the amount of $401,464 and an ordinary loss from the same transactions in the amount of $401,412. On his 1982 tax return, Mr. Leinbach reported a long-term capital gain from GGS transactions in the amount of $461,444.[15]

OPINION

## 1. Losses on Forward Contracts

The central issue in these cases is whether the losses claimed by petitioners are bona fide or whether they are based

---

[15]An amended return was filed for 1981 and 1982 as a protective claim for refund of the reported gain because the Commissioner on audit disallowed the GGS losses previously reported.

upon an elaborate sham. Respondent contends that the losses were generated in form without any substance, that the underlying transactions were fictitious, and that such transactions existed only within the GGS computer. On the other hand, petitioners contend that the losses were genuine and were the result of bona fide transactions entered into for profit under section 165(c)(2) and are clearly allowable under section 108 of the Tax Reform Act of 1984, Pub. L. 98–369, 98 Stat. 680, or the standard laid down in *Smith v. Commissioner*, 78 T.C. 350 (1982).

Section 165(a) allows a deduction for a loss sustained during the taxable year that is not compensated for by insurance or otherwise. In the case of individuals, however, the deduction is limited to losses incurred in a trade or business, in a transaction entered into for profit, or as the result of a casualty or theft. Sec. 165(c). In any event, to be deductible, the claimed loss must be the result of a bona fide transaction, and substance, not mere form, shall be the determining factor. Sec. 1.165–1(b), Income Tax Regs. See *Gregory v. Helvering*, 293 U.S. 465 (1935).

Respondent's determination that the underlying transactions are not bona fide is presumptively correct; and petitioners have the burden of proof. *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934); Rule 142(a).

A careful review of the voluminous record leads us to the inescapable conclusion that petitioners have failed to establish that the transactions leading to their alleged losses were bona fide. In fact, from the record as a whole, we are satisfied that petitioners have failed to establish that the entire program from which the losses allegedly arose did not exist solely to provide tax benefits for its investors.

All of the forward contracts promoted by Mr. Gregory were between GGS, as one party, and one petitioner or some other participant, as the other party. Furthermore, each petitioner as well as all other participants executed a power of attorney which authorized GGS and/or GIM to execute and perform any act for the investor with respect to the contracts that GGS and GIM deemed expedient and at a price determined by GGS and adjusted for any reason which GGS considered appropriate. In addition, an ultimate profit obviously could be, and at times

was to a nominal extent, manipulated by GGS merely by foregoing a part of the fees cited in the disclosure memorandum or by utilizing its pricing formula.

These cases are analogous to, if not factually indistinguishable from, the situation recently considered by us in *Julien v. Commissioner*, 82 T.C. 492 (1984). In *Julien v. Commissioner, supra,* we disallowed interest deductions on alleged indebtedness incurred to purchase silver bullion in a series of purported cash and carry silver straddles. Having found that the taxpayers never actually purchased any silver nor incurred any real indebtedness, we concluded that the underlying transaction was a factual sham and served no economic purpose beyond generating a tax deduction for interest. Commenting on the lack of risk due to the fixed nature of the straddles involved in *Julien,* we stated at page 508:

It seems self-evident that, in any commodity straddle, a legitimate investor must have some potential of making money as a result of various market forces and, by the same token, be a[t] risk of losing money. One commentator has said that "A commodity straddle is held in the expectation of profiting from a change in the 'spread' or 'premium', the difference in price between two futures contracts. While the price movements of the two contracts will have some relationship to each other, as the prices will be affected by similar economic conditions, neither in theory nor in practice are the fluctuations identical." See R. Dailey, "Commodity Straddles in Retrospect: Federal Income Tax Considerations," 47 Brooklyn L. Rev. 321 (Winter, 1981). Presumably, fluctuations would also occur in a case where the investor holds silver bullion against a forward contract, if the end result were not, as here, prearranged.

In *Falsetti v. Commissioner*, 85 T.C. 332 (1985), we found that an alleged sale was a "sham in substance" which we defined as being "the expedient of drawing up papers to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits."

The facts before us are also somewhat similar to those described in *United States v. Winograd*, 656 F.2d 279, 281 (7th Cir. 1981), affirming defendant's conviction under section 7206(2) of conspiring to impair the collection of income taxes by claiming losses on tax straddles in futures contracts in Mexican pesos which were not entered into through bona fide trades or open bids on an established market but instead were prearranged, uncompetitive trades between various employees

of one of the principals involved. See also *United States v. Turkish*, 623 F.2d 769 (2d Cir. 1980); *United States v. Siegel*, 472 F. Supp. 440 (N.D. Ill. 1979). The conclusion that the disputed transactions in the cases before us are not bona fide is even more appropriate in view of our finding that GGS was not only a party to each of the forward contracts but also in most instances executed, canceled, and assigned the contracts under powers of attorney for the other parties. Furthermore, the contracts were executed, canceled, and assigned at prices determined solely by GGS, and the only third parties to any of the transactions (RST and NIG) were closely associated with Mr. Gregory through business or otherwise.

We conclude, therefore, that the losses claimed by petitioners are not allowable because the disputed transactions constituted factual shams which were inspired, designed, and executed by Mr. Gregory and the two corporations controlled by him for the sole purpose of attempting to achieve tax losses for their investors.[16]

This conclusion is not altered by our decision in *Smith v. Commissioner, supra*, or by section 108 of the Tax Reform Act of 1984, because they do not apply to alleged straddles which are in fact fake or fictitious. *Miller v. Commissioner*, 84 T.C. 827 (1985); *Forseth v. Commissioner*, 85 T.C. 127 (1985); *Magin v. Commissioner*, T.C. Memo. 1985–304.

### 2. Fees Paid With Respect to Forward Contracts

Fees paid by petitioners to GGS were paid so that they could participate in Gregory's program. Inasmuch as we have found that the program was operated solely to provide tax deductions for its participants, the fees constituted payments to purchase such deductions and as such are, at best, personal expenditures which are not deductible under section 162 or section 212. *Zmuda v. Commissioner*, 79 T.C. 714 (1982), affd. 731 F.2d 1417 (9th Cir. 1984); *Houchins v. Commissioner*, 79 T.C. 570 (1982). See also *Falsetti v. Commissioner*, 85 T.C. 332 (1985).

---

[16]In view of our finding with respect to the sham issue, we need not consider the other contentions advanced by respondent with respect to the losses.

## 3. *Additions to Tax Under Section 6653(a)*

Respondent determined that an addition to tax is due from petitioners Ellison C. and Linda Morgan for negligence under section 6653(a). In view of our finding hereinbefore that the underlying transactions were in fact shams, and in view of our subsequent finding that petitioner Ellison C. Morgan knew or should have known at the time that they were shams, it is apparent that he ignored applicable law and regulations in the preparation of his returns. Consequently, respondent's determination that additions to tax are due from Ellison C. Morgan under section 6653(a) is sustained.

## 4. *Damages Under Section 6673*

Finally, we turn to respondent's request that damages be imposed against petitioners in each of these cases under section 6673. With respect to this issue and from the record as a whole, we are satisfied that, in spite of their protestations to the contrary, petitioners Dennis S. Brown, James E. Sochin, Ellison C. Morgan, and James N. Leinbach were mature, well-educated, and well-read individuals who were sufficiently knowledgeable and sophisticated with respect to business and tax matters to have known, and actually did know, at the time the disputed transactions were entered into, that the transactions were "too good" to be real and therefore were shams. However, transactions involving forward contracts and especially forward contracts entered into with respect to Ginnie Maes and Freddie Macs are extremely complicated and, during the years under consideration, were relatively new. Furthermore, from the time the petitions were filed in these cases up to and after the date of trial, the law with respect to tax straddles was uncertain. See *Miller v. Commissioner*, 84 T.C. 827 (1985); *Forseth v. Commissioner*, 85 T.C. 127 (1985); and *Julien v. Commissioner*, 82 T.C. 492 (1984). Consequently, we are reluctant to conclude that petitioners were also aware that tax claims stemming from their transactions with Gregory and his associates might constitute a basis for the imposition of damages under section 6673, although the Supreme Court had held for many years that claims based upon unreal and sham transactions were not recognizable for tax purposes. See *Gregory v. Helvering*, 293 U.S. 465 (1935);

*Higgins v. Smith*, 308 U.S. 473 (1940); and *Knetsch v. Commissioner*, 364 U.S. 361 (1960), affg. 272 F.2d 200 (9th Cir. 1959). We hereby serve notice, however, that henceforth we will have no such reluctance with respect to petitioners who file petitions or maintain positions based upon transactions which they knew or reasonably should have known to be factual shams.

We feel that such action is warranted because Congress is concerned with the substantial increase in the number of petitions pending before the Tax Court and especially those petitions based upon frivolous or groundless claims. The concern of Congress in this connection is apparent from the Conference report on the consideration of section 6621(d)(4) dealing with increased interest on substantial underpayments attributable to tax motivated transactions. There it is stated:

> The conferees note that a number of the provisions of recent legislation have been designed, in whole or in part, to deal with the Tax Court backlog. Examples of these provisions are the increased damages assessable for instituting or maintaining Tax Court proceedings primarily for delay or that are frivolous or groundless (sec. 6673), the adjustment of interest rates (sec. 6621), the valuation overstatement and substantial understatement penalties (secs. 6659 and 6661), and the tax straddle rules (secs. 1092 and 1256).
> * * *
> The conferees believe that, with this amendment, the Congress has given the Tax Court sufficient tools to manage its docket, and that the responsibility for effectively managing that docket and reducing the backlog now lies with the Tax Court. The positive response that the Court has made to several recent GAO recommendations is encouraging and the conferees expect the Court to implement swiftly these and other appropriate management initiatives. The conferees also note favorably the steps the Court has begun to take in consolidating similar tax shelter cases and dispensing with lengthy opinions in routine tax protester cases. The Court should take further action in these two areas, as well as to assert, without hesitancy in appropriate instances, the penalties that the Congress has provided.
> [H. Rept. 98–861 (Conf.) (1984), 1984–3 C.B. (Vol. 2) 1, 239.]

Our own concern for the continuing increase in the number of petitions based upon frivolous or groundless claims has been clearly expressed in such opinions as *Sydnes v. Commissioner*, 74 T.C. 864, 872 (1980), where we stated:

> While in the past we have been reluctant to impose damages in cases involving persons other than those who were merely protesting the Federal tax laws, we think the imposition of damages in the circumstances here is fully warranted. Moreover, since the statute does not restrict us to those

cases in which a party has requested us to impose damages, we think we should do so, on our own motion, where the facts and circumstances so dictate.

Here, the Court and respondent have been required to consider the same issue twice after it had already been decided by this Court and affirmed by the Court of Appeals. Petitioners with more genuine controversies have been delayed while we considered these cases involving the same issue. In these circumstances, the petitioner, an accountant with some knowledge of the Federal tax laws, cannot and has not shown that he, in good faith, has a colorable claim to challenge the Commissioner's determination. Indeed, he knew when he filed the present case with this Court that he had no reasonable expectation of receiving a favorable decision. No reasonably prudent person could have expected this Court to reverse itself in this situation.

In *Oneal v. Commissioner*, 84 T.C. 1235, 1243–1244 (1985), we warned such petitioners as follows:

We have frequently found that cases based upon meritless contentions and stale arguments are burdensome both on this Court and upon society as a whole. See *Abrams v. Commissioner*, 82 T.C. 403 (1984). The time spent upon this case has delayed other cases of merit which could have provided new precedents to the tax system. Petitioners' brief, much like their abusive tax shelter "investment," was merely a prepackaged, pro forma presentation.

Upon review of this record, we find that petitioners' positions are frivolous and groundless and that this proceeding was instituted and maintained primarily for delay. We admonish other petitioners and their counsel not to maintain frivolous proceedings before this Court or to maintain them primarily for delay.

Again, in *Abrams v. Commissioner*, 82 T.C. 403, 411–412 (1984),[17] we summed up the situation in the following manner:

The Court of Appeals for the Ninth Circuit has, in a summary and decisive manner, awarded double costs in several tax protester cases on its own motion. On July 7, 1982, in *Edwards v. Commissioner*, 680 F.2d 1268, 1271 (9th Cir. 1982), affg. per curiam an unreported decision of this Court, the Court said—

"Meritless appeals of this nature are becoming increasingly burdensome on the federal court system. *We find this appeal frivolous.* Fed. R. App. P. 38, and accordingly award double costs to appellee [the Commissioner of Internal Revenue]. * * * [Citations omitted; emphasis added in 82 T.C.]"

Accord *McCoy v. Commissioner*, 696 F.2d 1234 (9th Cir. 1983), affg. 76 T.C. 1027 (1981); *Barmakian v. Commissioner*, 698 F.2d 1228 (9th Cir. 1982), affg.

---

[17]See also *Stafford v. Commissioner*, T.C. Memo. 1983–650, and *Vickers v. Commissioner*, T.C. Memo. 1983–429.

without published opinion an unreported order and decision of this Court; *Martindale v. Commissioner*, 692 F.2d 764 (9th Cir. 1982), affg. without published opinion an unreported order and decision of this Court.

It is now certain that all Courts will no longer tolerate the filing of frivolous appeals. On June 13, 1983, the Supreme Court, for the first time, invoked the provisions of its rule 49.2, which the Court adopted in 1980, and ordered an appellant to pay damages for bringing a frivolous appeal. In *Tatum, Elmo C. v. Regents of Nebraska-Lincoln* (No. 82–6145), the Court issued the following order: "The motion of respondents for damages is granted and damages are awarded to respondents in the amount of $500.00 pursuant to Supreme Court Rule 49.2."

The direction of this nation's highest court is crystal clear—that no court should permit frivolous or groundless appeals, not only in discrimination suits but in any other area of litigation, including Federal income taxation. The language of amended section 6673 is equally clear.

[Fn. refs. omitted.]

Finally, in *Elliott v. Commissioner*, 84 T.C. 227, 248 (1985), we stated that "At some point, the arguments in these highly leveraged tax avoidance (or evasion) schemes must be regarded as 'frivolous or groundless,' [under] section 6673."[18]

Even though the positions maintained by petitioners in these cases may be frivolous and groundless, we decline to impose damages as provided by section 6673 against these petitioners because prior to the publication of this opinion they were not aware that we would consider doing so in factual situations such as theirs. This is not to be construed, however, as any indication that specific notice is required before damages are imposed in a future case because, as held in *Abrams v. Commissioner*, 82 T.C. 403 (1984), in a proper case we can and will impose such damages even on our own motion.

*Decisions will be entered under Rule 155.*

---

[18]See also *Snyder v. Commissioner*, T.C. Memo. 1985–9, where we concluded, "it is apparent from the overall record * * * that petitioner was a party to an abusive tax shelter. This type of arrangement disparages good tax planning and denigrates both the Congressional purpose inherent in the credits and deductions which we here disallow and our national tax system. Petitioner knew, or reasonably should have known, this when he agreed to participate in this specious stratagem of tax illusion. Petitioner, and those like him, who exchange small cash amounts for large tax deductions because of pie-in-the-sky nonrecourse transactions arranged to jack up basis without underlying economic substance or entrepreneurial risk may become subject to consequences unanticipated by the parties. See *Barnard v. Commissioner*, 731 F.2d 230 (4th Cir. 1984), affg. *Fox v. Commissioner*, 80 T.C. 972 (1983)."

Reviewed by the Court.

STERRETT, SIMPSON, GOFFE, CHABOT, NIMS, PARKER, WHITAKER, KÖRNER, HAMBLEN, COHEN, CLAPP, JACOBS, WRIGHT, PARR, and WILLIAMS, *JJ.*, agree with this opinion.

WILBUR, *J.*, concurs in the result only.

SWIFT and GERBER, *JJ.*, did not participate in the consideration of this case.