T.C. Memo. 1996-216

UNITED STATES TAX COURT

CARL J.D. BAUMAN AND MARGARET A. BAUMAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 37669-85, 38099-85.          Filed May 2, 1996.

<u>Robert L. Manley</u>, for petitioners.

<u>Linda J. Wise</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WRIGHT, <u>Judge</u>:  Respondent determined deficiencies in and
additions to petitioners' Federal income taxes as follows:[1]

---

[1]Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the years at issue, and
all Rule references are to the Tax Court Rules of Practice and
Procedure.

Docket No. 37669-85

| | | Additions to Tax | | |
|---|---|---|---|---|
| Year[1] | Deficiency | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6651 |
| 1979 | $12,476 | [2]$624 | -- | -- |
| 1980 | 19,023 | [2] 951 | -- | -- |
| 1981 | 13,573 | 679 | [3] | $4,072 |

Docket No. 38099-85

| | | Additions to Tax | | |
|---|---|---|---|---|
| Year[1] | Deficiency | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6651 |
| 1982 | $28,019 | $1,705 | [3] | $3,167 |

[1]Increased interest under sec. 6621(c) was imposed.
[2]The additions to tax for 1979 and 1980 were determined pursuant to sec. 6653(a).
[3]50 percent of the interest due on $13,573 and $28,019 for taxable years 1981 and 1982, respectively.

After concessions, the issues for decision are:[2]

(1)  Whether a lease transaction entered into by Energy Resources, Ltd. (ERL), a limited partnership of which petitioner husband was a limited partner, was devoid of economic substance. We hold that it was.

_____

[2]The petition also presents an issue of whether respondent is barred from assessing the taxes at issue pursuant to sec. 6501.  Petitioners, however, did not address this issue at trial, nor did they discuss it in their posttrial briefs.  Accordingly, the issue is deemed to have been conceded and is not discussed herein.

(2) Whether notes ERL issued with respect to advance royalty payments due under a lease agreement represented bona fide indebtedness. We hold that they did not.

(3) Whether annual payments ERL agreed to pay under a lease agreement were properly accrued and deducted as advance royalties due under a minimum royalty provision described under section 1.612-3(b), Income Tax Regs. We hold that they were not.

(4) Whether ERL was engaged in an activity for profit. We hold that it was not.

(5) Whether petitioners have established their entitlement to various other deductions stemming from ERL's mining operations pursuant to section 183(b). We hold that they have not.

(6) Whether petitioners are liable for the addition to tax under section 6653(a) for taxable year 1980 and under section 6653(a)(1) and (2), for taxable years 1981 and 1982. We hold that they are.

(7) Whether the increased interest rate attributable to tax-motivated transactions under section 6621(c) applies. We hold that it does to the extent stated herein.

(8) Whether petitioners are liable for the addition to tax under section 6651(a)(1) for failure to file their 1982 tax return by the prescribed date. We hold that they are.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are

incorporated herein.  At the time the petition was filed in this case, petitioners resided in Anchorage, Alaska.

This case is part of a group of cases identified by respondent as McIntyre-CN.  McIntyre-CN is a national litigation project involving coal mining partnerships promoted by Richard McIntyre (McIntyre).

Petitioner husband (Bauman) has been employed as an attorney with the same law firm (law firm) in Anchorage, Alaska, since 1973.  He has been a partner in that law firm since 1975.

Petitioners timely filed their Federal income tax return for 1979.  Petitioners' Federal income tax return for 1980 was not received by the Internal Revenue Service (IRS) until May 8, 1981. Attached to petitioners' return for taxable year 1980 is a brief handwritten note in which Bauman explains the reason for the untimely filing.  This note essentially states that confusion brought about by petitioner wife's (Mrs. Bauman) second pregnancy caused the couple to overlook the filing deadline.  The note concludes with the statement "it won't happen again". Petitioners' Federal income tax return for 1982 was not received by the IRS until June 10, 1983.  Attached to petitioners' return for taxable year 1982 is a brief typewritten note in which Bauman explains the reason for the couple's delinquent filing.  In this note, Bauman principally asserts that the couple was unable to satisfy their obligation to file their return by the prescribed date because Bauman's father was ill and that such illness

required Bauman's periodic attention.  Petitioners' Federal income tax return for 1981 was not received by the IRS until June 30, 1983.  The record does not contain an explanation for the tardiness of petitioners' return for taxable year 1981.

Background

During the taxable years at issue,[3] Bauman was a limited partner in ERL.  In 1980, ERL, as lessee, entered into a lease agreement with JAD Coal Co., Inc. (JAD), as lessor, to mine and market coal underlying certain land in Harlan County, Kentucky. This lease transaction was the subject of this Court's opinion in Bauman v. Commissioner, T.C. Memo. 1988-122 (occasionally Bauman I).[4]  In Bauman I, this Court held that ERL's royalty obligations under its lease agreement with JAD were not "substantially uniform" and were not "paid at least annually".  As such, we further held that the royalty obligations were not deductible as advance royalties paid or accrued "as a result of a minimum royalty provision" under section 1.612-3(b), Income Tax Regs. The Court granted respondent's motion for partial summary judgment with respect to this minimum royalty issue.  Bauman I, however, was limited to the question of whether the royalty obligations qualified under a minimum royalty provision as

_____

[3]The parties have reached settlement with respect to taxable year 1979.  The issues before the Court pertain to taxable years 1980, 1981, and 1982.

[4]The parties in Bauman v. Commissioner, T.C. Memo. 1988-122, are identical to the parties in the instant case.

envisioned by section 1.612-3(b), Income Tax Regs.  Bauman I involved taxable years 1979, 1980, and 1981.  Bauman v. Commissioner, supra.

Subsequent to this Court's decision in Bauman v. Commissioner, supra, we decided Coggin v. Commissioner, T.C. Memo. 1993-209, affd. 71 F.3d 855 (11th Cir. 1996) (occasionally the Coggin case).  The Coggin case was among a number of cases included in respondent's national litigation project entitled McIntyre-CN.  Like Bauman in the instant case, the taxpayer in the Coggin case was a limited partner in ERL.  As a majority of the facts in the Coggin case are identical to the facts in the instant case, the parties have stipulated pertinent parts of the record in the Coggin case.

As a result of Bauman's investment in ERL, petitioners claimed certain losses and credits on their Federal income tax returns for 1980, 1981, and 1982.  Respondent determined that ERL was a sham, engaged in solely for the resulting tax benefits, and disallowed the losses and credits claimed by petitioners for each year at issue.

Energy Resources, Ltd.

ERL was a Tennessee limited partnership.  It operated under the accrual method of accounting.  Investors were solicited through a private placement memorandum (the offering memorandum or offering materials) dated October 1, 1980.  The offering materials explained that ERL was organized to lease (the lease)

3,520 acres of land in Harlan County, Kentucky (occasionally the coal property), and that ERL would earn future income for its partners by exploiting its rights under the lease. The offering materials consisted of 94 pages of information concerning the offering and contained a discussion of a variety of matters, including the partnership's objectives, the terms of the agreement, potential risk factors, and related Federal tax issues. Sixteen pages of the 94-page offering memorandum consisted of a discussion regarding the Federal income tax consequences relating to the offering. Attachments to the offering memorandum included a tax opinion, a Coal Reserve Report, and accounting and productivity projections. Although many of these attachments were lacking in detail and specificity, the tax opinion was an exception. The tax opinion, which was authored by the taxpayer in the Coggin case, exceeded 100 pages in length and was extensive and thorough. The offering memorandum also contained 12 exhibits. Included among the exhibits were a copy of the limited partnership agreement, a copy of the lease agreement, and copies of various partnership promissory notes.

McIntyre was ERL's managing general partner and the sponsor of the offering materials. ERL's associate general partner was McIntyre's brother, Charles McIntyre. The offering materials advised potential investors that McIntyre was the president of Economic Research Analysts, Inc. (ERA). ERA was an entity with

various specialties, including tax incentive investments. Potential investors were further advised that McIntyre's experience in the coal mining business was limited and that McIntyre's involvement as a general partner in other mining partnerships might compete with ERL for McIntyre's time.

Pursuant to the offering materials, 200 limited partnership units were available to prospective investors. The minimum investment was one unit per investor; however, McIntyre possessed authority to issue fractional units to a maximum of 35 investors. According to the terms set forth in the offering materials, the capital contribution for each unit was $190,000. This amount consisted of $45,000 in cash and a promissory note in the amount of $145,000 executed by each investor and payable to ERL. The cash portion of each investor's capital contribution was payable in three annual installments. The offering materials explained that each investor's capital contribution represented his or her proportionate personal liability for three recourse notes, which were to be executed by ERL and payable to JAD, for advance minimum royalties due during the first 3 years of the lease. Accordingly, the total capital contribution by limited partners was designed to equal $38 million.

The offering materials contained a copy of the ERL limited partnership agreement (agreement). Pursuant to the terms of the agreement, 99 percent of ERL's profits and losses were to be allocated to the limited partners. The two general partners were

to receive the remaining 1 percent of ERL's profits and losses. The agreement explained that McIntyre, as managing general partner, had the responsibility of managing the partnership's affairs. The offering materials further explained that McIntyre would receive an acquisition fee equal to 22 percent of the total cash contributions made by the limited partners to ERL in 1980, 1981, and 1982. As managing general partner, McIntyre was also entitled to a management fee in the amount of $1 per ton of coal mined by or for the partnership. Payment of this fee, however, was conditioned on ERL's realization of a minimum per-ton profit of $4. Additionally, the management fee was structured to terminate once the limited partners received cash distributions equal to their total cash contributions.

The principal term of ERL's lease with JAD was 30 years; however, ERL could terminate the lease in the event the retrieval of coal became economically prohibitive. Additionally, if and to the extent that ERL determined it to be economically feasible, ERL had the option of extending the primary term of the lease on a yearly basis.

The terms of the lease obligated ERL to pay JAD an advance production royalty of 8 percent of ERL's gross coal sales. The lease also obligated ERL to pay JAD a minimum annual advance royalty of $10 million. ERL was required to pay the minimum advance royalties annually and each such payment was due without regard to actual production levels; however, such payments were

subject to credits from actual production.  The first two minimum annual royalty payments were to consist of a cash payment and a promissory note.  All remaining payments were to consist of individual promissory notes.  The first 3 notes were to be denoted as "recourse" notes, while the remaining 17 notes were to be considered "nonrecourse" notes.  The first note was to be executed on the date the lease was created, and each subsequent note was to be delivered to JAD on the same date of each successive year.  This payment pattern was to continue for the shorter of 20 years or the life of the lease.  The following table depicts the manner in which the offering materials presented the discharge of the annual royalty payments:

| Source | 1980 | 1981 | 1982 | 1983-99 |
|---|---|---|---|---|
| Cash | $750,000 | $250,000 | -- | -- |
| Recourse note | 9,250,200 | 9,750,000 | $10,000,000 | |
| Nonrecourse notes | --- | --- | --- | $10,000,000 (each) |
| Total | 10,000,000 | 10,000,000 | 10,000,000 | 170,000,000 |

The partnership agreement was structured such that the $29 million in notes issued by the limited partners to purchase the partnership units represented the limited partners' personal liability for the first three annual notes of the partnership for

royalty payments. ERL's total liability for the advance royalties, however, totaled $200 million in cash and notes.

Each note, recourse and nonrecourse, became due 20 years after execution; however, at the election of either JAD or ERL, each note could be extended for an additional 10 years. Although each note bore annual interest at a rate of 6 percent, no partner was personally liable for the payment of such interest. The maturity date of each recourse note would not change if the lease were terminated prior to its primary term. The offering materials explained that the coal reserves underlying the leased property would serve as security for each note.

The coal property was acquired by JAD in 1977 for $3,750,000. Information pertaining to this acquisition was presented in the offering materials. The offering materials explained that the coal property contained three principal coal seams; namely the Mason, Harlan, and Wallins Creek seams. The offering materials further explained that the objective of the partnership was to develop these three seams and then to develop other seams if such development were practicable. The Coal Reserve Report, which accompanied the offering memorandum, however, did not lend solid support for this objective. Although it maintained that the Mason seam was "of good quality", the Coal Reserve Report noted that the Mason seam was not without serious limitations. The report further indicated that coal recovered from the Harlan seam would be burdened by a high ash content and

would require additional premarketing procedures. Moreover, because the Wallins Creek seam had already been extensively mined, the Coal Reserve Report concluded that no recoverable coal reserves existed in the Wallins Creek seam. The Coal Reserve Report continued and further discussed several shortcomings with other potential seams.

The record does not support a finding that the Coal Reserve Report was prepared by a qualified expert. The author of the Coal Reserve Report subsequently became an employee of ERL and performed other work for the coal partnerships organized and operated by McIntyre. Nevertheless, the report estimates that the property contained approximately 52.6 million tons of total potential coal reserves. This figure consists of 23.6 million tons in calculated recoverable reserves and 29 million tons in possible additional reserves. The Coal Reserve Report explained, however, that the above figure regarding possible additional reserves was uncertain and that additional exploration was needed to verify its accuracy. The Coal Reserve Report did not conclude whether it would be profitable to mine the underlying property, but it did indicate that a prudent production estimate was approximately 1 million tons of coal per year. The Coal Reserve Report did, however, warn potential investors that an in-depth study was necessary before an assessment of the property's profitability could be made. No such study was ever performed.

The tax opinion contained in the offering materials was exhaustive. It discussed essentially all relevant Code sections, Treasury regulations, and revenue rulings pertaining to the structure of ERL and its transactions. Much case law was also presented, explaining how the courts had interpreted the various Code sections, regulations, and rulings discussed therein.

The accounting projections accompanying the offering materials included an estimate of ERL's taxable income for 1980, 1981, and 1982. Also included in the accounting projections was an analysis of ERL's estimated mining operations for the 29-year period ending with 2009. The accounting projections estimated that ERL would realize a net loss of $10,105,000 in 1980. Similarly, for 1981 and 1982, net losses were estimated to be $9,200,000 and $7,712,500, respectively. As previously stated, all but 1 percent of these losses were allocable to the limited partners pursuant to the partnership agreement. The accounting projections further explained that, in light of this loss forecast, and based on the limited partners' cash capital contributions, the ratios of the tax deductions to the cash capital contributions would be 333 percent, 304 percent, and 255 percent, respectively, for 1980, 1981, and 1982.

The accounting projections also contained a tabular analysis of projected mining operations. It was projected that ERL would sell 200,000 tons of coal in 1981. The projections increased annually, and during the period from 1989 through 2009 it was

projected that ERL would sell in excess of 2 million tons of coal per year. This tabular analysis, however, bore the qualification that all projections were hypothetical and were in no way warranted or guaranteed.

The offering materials advised potential investors that there were no assurances as to the accuracy of the recoverable coal estimates upon which the substance of the offering materials depended. Potential investors were also advised by the offering materials that ERL did not have any existing long-term contracts for the sale of coal and that future demand for coal was unpredictable. The offering materials further advised potential investors that McIntyre had limited experience in the mining business and that extensive competition should be expected from entities with substantially superior financial, technical, and intellectual resources. The offering materials also discussed the probable likelihood of labor disputes common to the geographic area in which the land covered by the lease was situated.

ERL executed the lease agreement for the coal property on December 1, 1980. The terms of the lease were consistent with the representations presented in the offering materials.

In 1980 and 1981, ERL received eight mining permits. Two of the mines were never operated; the remaining six mines produced an approximate total of 167,000 tons of coal. All ERL mining operations ceased by the end of 1981, and no other coal was

produced from the coal property subsequent to that time.  The mines were not reclaimed or restored to their premining condition, and ERL forfeited the reclamation bonds it had posted in order to obtain the mining permits.

Mr. and Mrs. Bauman

Neither Bauman nor Mrs. Bauman had any formal education, training, or experience in coal mining.  Bauman purchased two-thirds of a partnership unit in ERL.  This purchase was motivated at least in part by Bauman's prior participation in a coal mining project promoted and managed by McIntyre.  Many of the partners in Bauman's law firm were also involved in McIntyre-related coal projects.  Several of these partners were also limited partners in ERL.  The members of the law firm routinely discussed with one another the potential opportunities presented by an ERL investment.  Bauman's preinvestment research of ERL was principally limited to these intrafirm discussions and a review of the information contained in the offering materials.

OPINION

Petitioners maintain that respondent has erroneously determined that they are liable for the deficiencies, additions to tax, and increased interest set forth at the beginning of this opinion.  The essence of petitioners' argument is twofold. First, petitioners maintain that ERL was a legitimate entity organized and managed with a true and objective profit motive. Petitioners also contend that they invested in ERL only after

consulting various professionals and that such investment was undertaken with the intent of making a profit.  Accordingly, petitioners conclude, such consultation and reliance preclude a finding that they were negligent.

Respondent rejects petitioners' arguments as self-serving and contends that the sole purpose underlying ERL's formation was to enable the limited partners to claim tax benefits based on the pass-through of enormous losses.  As a result, respondent maintains, ERL's lease transaction was devoid of economic substance and, as such, must be disregarded for Federal income tax purposes.  Respondent further maintains that ERL was not engaged in an activity for profit and that petitioners have failed to substantiate various ERL deductions.  Respondent also maintains that certain additions to tax are appropriate for each year at issue.

Issues 1 & 2.  Economic Substance & Bona Fide Indebtedness

Numerous cases hold that transactions which are devoid of economic substance are to be disregarded for Federal tax purposes.  See Larsen v. United States, 89 T.C. 1229, 1252 (1987), affd. in part and revd. in part sub nom.; Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990); Rose v. Commissioner, 88 T.C. 386, 410 (1987), affd. 868 F.2d 851 (6th Cir. 1989).  In James v. Commissioner, 87 T.C. 905, 918 (1986), affd. 899 F.2d 905 (10th Cir. 1990), we summarized the holdings of such cases and explained that a transaction will not be

recognized for Federal income tax purposes if it is a sham or is otherwise devoid of economic substance. See Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978); Knetsch v. United States, 364 U.S. 361, 366 (1960); Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820 F.2d 1543 (9th Cir. 1987), affg. T.C. Memo. 1986-23; Falsetti v. Commissioner, 85 T.C. 332 (1985). The substance of the transaction, not its form, determines its tax consequences. Gregory v. Helvering, 293 U.S. 465 (1935). A transaction must have economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax avoidance features that have meaningless labels attached. Frank Lyon Co. v. United States, supra; Hilton v. Commissioner, 74 T.C. 305 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982).

There are several key indicators which are helpful in determining whether a transaction possesses or lacks economic substance. Among these are (1) the presence or absence of arm's-length price negotiations, (2) the relationship between the sales price and fair market value, (3) the structure of the transaction's financing, (4) the degree of adherence to contractual terms, and (5) whether there was a shifting of the benefits and burdens of ownership. See, e.g., Helba v. Commissioner, 87 T.C. 983 (1986), supplemented by T.C. Memo. 1987-529, affd. without published opinion 860 F.2d 1075 (3d Cir. 1988); Zirker v. Commissioner, 87 T.C. 970 (1986); James v.

<u>Commissioner</u>, <u>supra</u>; <u>Grodt & McKay Realty, Inc. v. Commissioner</u>, 77 T.C. 1221 (1981); <u>Karme v. Commissioner</u>, 73 T.C. 1163 (1980), affd. 673 F.2d 1062 (9th Cir. 1982)

In evaluating whether a transaction is a sham, the Court of Appeals for the Ninth Circuit, to which this case is appealable, applies a two-factor test. The analysis requires an examination of both the objective and subjective aspects of the transaction. The objective factor focuses on whether the transaction would have been likely to produce economic benefits aside from tax benefits. The subjective analysis focuses on whether the taxpayer entered into the transaction with a bona fide business purpose other than tax avoidance. <u>Bail Bonds by Marvin Nelson, Inc. v. Commissioner</u>, <u>supra</u>. The Court of Appeals, however, does not apply these two factors in a rigid fashion. <u>Sochin v. Commissioner</u>, 843 F.2d 351 (9th Cir. 1988), affg. <u>Brown v. Commissioner</u>, 85 T.C. 968 (1985). Instead, both factors are viewed in a manner intended to aid the court's traditional analysis with respect to alleged sham transactions. The underlying objective is to determine whether the transaction had any practical economic effects other than the creation of tax losses. <u>Id.</u>

In the instant case, respondent determined that ERL's lease transaction lacked economic substance. Accordingly, petitioners have the burden of proving that respondent's determination is erroneous. Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111 (1933).

The issue involving the economic substance of ERL's lease transaction has twice before been decided in respondent's favor. In both Coggin v. Commissioner, T.C. Memo. 1993-209, and Suivski v. Commissioner, T.C. Memo. 1993-291, this Court held that ERL's lease transaction lacked economic substance and, pursuant to the line of cases identified above, was to be disregarded for Federal income tax purposes. Petitioners have failed to persuade us that a different outcome is now appropriate.

On brief, petitioners have expended much effort in an attempt to convince us that ERL was a legitimate entity that should not be disregarded as a sham. Despite this effort, however, we find petitioners' argument cursory and unconvincing. We agree with respondent that the majority of the offering materials consisted of information pertaining to the tax benefits associated with the venture. We also agree that such material was extensive and thorough as compared to most of the remaining contents of the offering materials. The offering materials provide minimal insight as to the actual profit-making potential of the coal mining venture. See Rose v. Commissioner, supra at 412.

Petitioners contend that the offering materials focus principally on the risks rather than the benefits of the underlying investment. We disagree. Having carefully examined the offering materials, we are convinced that such materials, when collectively considered, heavily emphasize relevant tax

issues properly characterized as benefits ensuing from the investment.

Respondent argues that ERL entered into the lease agreement with JAD without regard to whether the royalty obligations were commensurate with the fair market value of the coal that could reasonably be extracted from the leased property. Petitioners contend that respondent fails to understand the complexities of the financial transaction as structured by McIntyre. In light of the evidence contained in the record, however, we agree with respondent and conclude that the royalty obligations at issue substantially exceed the fair market value of ERL's rights under its lease with JAD. See Coggin v. Commissioner, supra. Petitioners have failed to establish that ERL's purported royalty obligations of $200 million were reasonably commensurate with the fair market value of the coal underlying the leased property. Perhaps the most compelling fact rendering support to this conclusion is that JAD acquired the land covered by the lease for $3,750,000 on July 30, 1977, approximately 3 years prior to ERL's execution of the lease with JAD for the same property. Id. Petitioners attempt to address this disparity in two ways. First, they advance a misguided argument based on the concept of present valuation analysis. Petitioners also argue that subsequent to JAD's acquisition of the subject property, the infrastructure of the property underwent extensive development.

We find neither argument persuasive.  Petitioners have failed to offer sufficient evidence to establish that the coal property's fair market value had so greatly appreciated to an amount which would justify ERL's agreement to pay $200 million in minimum royalties during the initial 20-year period of its lease. Rose v. Commissioner, supra at 412-419.  A grossly inflated price is a hallmark of a sham transaction.  Sacks v. Commissioner, 69 F.3d 982 (9th Cir. 1995), revg. T.C. Memo. 1992-596. Additionally, the record establishes that McIntyre acted without adequate information regarding the coal property when he executed ERL's lease with JAD.  Although McIntyre commissioned a firm to prepare the Coal Reserve Report contained in the offering materials, the report is inherently flawed as the leased property constitutes only a portion of the property covered by the report. Furthermore, McIntyre's actions and representations conflict with the substance of the Coal Reserve Report.  That is, despite the Coal Reserve Report's conclusion that the property subject to its scope could realistically be expected to produce 1 million tons of raw coal annually, McIntyre represented in the offering materials that the coal property would yield annually 2 million tons of marketable coal.  Moreover, the author of the report cautioned McIntyre that the report was based upon insufficient data and an additional in-depth study was necessary in order to render a determination of probable profitability.  No additional study was engaged.  See Rose v. Commissioner, 88 T.C. at 415.

Petitioners also contest respondent's argument that McIntyre disregarded evidence of comparable minimum royalty obligations in use at the time ERL entered into the lease with JAD. Petitioners restrict their attack on this argument to a challenge of respondent's expert's ability to appreciate the nature and quality of the transaction. Respondent's argument, however, is convincing. JAD leased a portion of the same property in October 1979 to an independent company. The terms of that agreement required the lessee to pay an annual minimum royalty of just under $25,000. Furthermore, ERL's manager of mining operations, a person possessing a thorough knowledge of the coal mining industry, testified that the largest minimum royalty with which he was familiar, excluding those in which McIntyre was a party, involved a lease which required an annual minimum royalty of $200,000 on an 80,000-acre tract of land. This witness did, however, attempt to justify the disparity by noting that while ERL's minimum royalty obligations were considerably higher than the minimum royalty obligations with which he was familiar, they were justified because ERL could defer each payment for up to 30 years. We reject this attempted justification and, based upon the record, conclude that ERL's minimum royalty obligations were not reasonably comparable to those provided under similar leases in the geographic region.

Respondent next argues that petitioners have failed to establish that ERL had an actual and bona fide objective to

satisfy its royalty obligations and generate a profit.  We agree.
Neither the testimony at trial nor the unreliable Coal Reserve
Report persuades us that ERL intended to generate sufficient
revenue to meet its royalty obligations and earn profits.

Petitioners assert that the lease between ERL and JAD was
negotiated at arm's length and that the notes representing ERL's
minimum royalty obligations were of a type commonly used in
business.  Essentially, petitioners attribute the structure of
the ERL's lease agreement to the financial wizardry of McIntyre.
We are not persuaded by petitioners' argument.  The entire
transaction is covered by a blanket of suspicion.  The terms of
the lease agreement, in effect, permit ERL to postpone payment on
each note for 30 years.  Moreover, no partner, limited or
general, was personally liable for the interest payable on such
notes.  Additionally, except for the first three notes, all
notes representing ERL's obligations were to be nonrecourse.
Nonrecourse financing is a common indicator of a sham
transaction.  Sacks v. Commissioner, supra; Ferrell v.
Commissioner, 90 T.C. 1154 (1988).  Such notes are not the type
of obligations commonly used in commerce or by banks and other
financial institutions.  See Rose v. Commissioner, supra at
419-421.

The Court is not convinced that the notes were bona fide
debt instruments.  Although petitioners claim that a letter from
JAD to Bauman which notified Bauman of ERL's default constitutes

evidence of the bona fide nature of the notes, we find petitioners' argument to be unpersuasive. That a note is labeled "recourse" is not itself dispositive; substance, not form, must govern. <u>Gregory v. Helvering</u>, 293 U.S. 465 (1935); <u>Zmuda v. Commissioner</u>, 731 F.2d 1417 (9th Cir. 1984), affg. 79 T.C. 714 (1982). A nonrecourse debt may be disregarded for tax purposes where it appears likely from all the facts and circumstances that the obligation will not be paid. <u>Waddell v. Commissioner</u>, 86 T.C. 848, 902 (1986), affd. per curiam on other issues 841 F.2d 264 (9th Cir. 1988). Even a recourse debt may not be recognized if its payment is unlikely or too contingent. <u>Id.</u> The three recourse notes at issue have a "strong nonrecourse flavor", and, because the record fails to establish that payment of any note, recourse or nonrecourse, was reasonably likely, we are not convinced that such notes represented bona fide indebtedness.

In sum, petitioners have not sustained their burden of establishing that ERL's activities were motivated by anything other than a desire to obtain the related tax benefits. See <u>Karr v. Commissioner</u>, 924 F.2d 1018, 1023 (11th Cir. 1991), affg. <u>Smith v. Commissioner</u>, 91 T.C. 733 (1988). The nature of the offering materials, the manner in which the partnership's activities were actually conducted, and the illusory nature of the lease agreement's financing convince us that ERL's lease with JAD was devoid of economic substance. Consequently, having

considered the underlying subjective business motivation and the objective economic substance of ERL's activity, we sustain respondent's determination that ERL's lease transaction was a sham which is to be disregarded for Federal income tax purposes.

Issue 3.  Minimum Royalty

ERL claimed substantial loss deductions on its 1980, 1981, and 1982 returns.  In material part, these deductions were attributable to "accrued advance royalties".  In Bauman v. Commissioner, T.C. Memo. 1988-122, a case involving the same partnership and the same lease, the Court held that the royalty obligations with respect to taxable years 1980 and 1981 were neither "substantially uniform" nor "paid at least annually".  Consistent with that holding, the Court further held that such royalties were not deductible as advance royalties paid or accrued "as a result of a minimum royalty provision" under section 1.612-3(b), Income Tax Regs.

The facts before the Court in the instant case are essentially identical to those before the Court in Bauman v. Commissioner, supra, where the Court granted a motion by respondent for partial summary judgment regarding the minimum royalty issue.  That case involved the years 1980 and 1981.  An additional year, 1982, is now before the Court.  The facts with respect to 1982, however, do not differ in any material aspect from those pertaining to 1980 and 1981.  Therefore, we reaffirm our earlier decision, and, for the reasons stated therein, hold

that, with respect to taxable year 1982 as well, ERL's royalty obligations are not deductible as advance royalties paid or accrued "as a result of a minimum royalty provision" under section 1.612-3(b), Income Tax Regs.  Accordingly, we decline petitioners' invitation to reverse our earlier decision and sustain respondent's determination as to this issue.

Issues 4 & 5.  Profit Motive & Substantiation

In the notice of deficiency, respondent also determined that ERL's activities were not engaged in for profit.  We sustain that determination, primarily for the reasons stated in Coggin v. Commissioner, T.C. Memo. 1993-209.  Petitioners have adduced no persuasive evidence or argument to distinguish their case from Coggin in this respect.  The objective facts presented in this case fail to establish that ERL entered into the lease with an actual and honest objective of making an economic profit, independent of tax savings.  See generally Drobny v. Commissioner, 86 T.C. 1326 (1986); Dreicer v. Commissioner, 78 T.C. 642 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983).  Consequently, we resolve this issue in favor of respondent.

Petitioners argue in the alternative that, if ERL was not engaged in an activity for profit, they are entitled to deduct their allocable share of ERL's expenses, excluding the royalty obligations, in accordance with section 183(b) for each year at issue.  Respondent contends that petitioners are in any event

precluded from taking such deductions because they have failed to substantiate their entitlement to them.  We agree with respondent.

Deductions are a matter of legislative grace, and petitioners bear the burden of proving that they are entitled to the deductions claimed.  Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934); Welch v. Helvering, 290 U.S. at 115.

Petitioners argue that, because respondent had possession of 25 boxes of ERL's records for a substantial period of time prior to trial, it is incumbent upon respondent to come forward with evidence establishing that the claimed deductions were not in fact paid or incurred by ERL.  We reject such a contention and decline to shift the burden of proof to respondent.  On brief, petitioners claim entitlement to various expenses, but the exhibits and self-serving testimony on which they rely fail to substantiate that the alleged expenses were in fact paid or incurred.  Consequently, respondent is sustained on this ssue.

Issue 6.  Section 6653(a) and Section 6653(a)(1) and (2)

Respondent determined that petitioners are liable for an addition to tax under section 6653(a) for 1980 and additions to tax under section 6653(a)(1) and (2) for 1981 and 1982. Petitioners bear the burden of proof in establishing that they are not liable for such additions to tax.  Rule 142(a).  Section 6653(a) for 1980 and section 6653(a)(1) for 1981 and 1982 provide

for an addition to tax equal to 5 percent of the underpayment of tax if any part of such underpayment is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2), as in effect for 1981 and 1982, provides for an addition to tax of 50 percent of the interest on that portion of the underpayment attributable to negligence. Negligence under section 6653(a) is the failure to do what a reasonable or ordinarily prudent person would do under the circumstances. Zmuda v. Commissioner, 731 F.2d at 1422; Neely v. Commissioner, 85 T.C. 934, 947 (1985).

Petitioners advance several arguments in an attempt to convince the Court that no addition to tax under section 6653(a) or section 6653(a)(1) and (2) is appropriate. Each argument, however, is self-serving and without merit. Petitioners first argue that section 6653's extensive history of amendments suggests that the section is inherently flawed, and, as such, should not be applied against them. We reject such an argument.

Petitioners next argue that respondent has treated various taxpayers in the McIntyre-CN litigation project differently with respect to the application of section 6653. This argument must be rejected because it is the well-established position of this Court that our responsibility is to apply the law to the facts of the case before us and to determine the tax liability of the taxpayer in that case. Davis v. Commissioner, 65 T.C. 1014, 1022

(1976). In reaching our decision, the Commissioner's treatment of other taxpayers is generally considered irrelevant. Id.

Petitioners next argue that Bauman invested in ERL only after extensive discussions with other partners in his law firm. They also contend that certain professional financial advisers were consulted by various partners of Bauman's law firm and that such consultations contributed to Bauman's decision to invest in ERL. We reject this argument as self-serving; it is not supported by the facts of the record.

Petitioners further argue that Bauman relied heavily on the contents of the offering materials, which petitioners contend were prepared by various experts. But those responsible for preparing the contents of the offering materials were not disinterested advisers, nor were they shown to be in fact experts. Moreover, Bauman was not an unsophisticated investor. We find his testimony regarding his alleged good faith reliance questionable. At best, the information contained in the offering materials was speculative conjecture. The offering materials were "long on conclusions, but short on reasoning", and we are skeptical that an intelligent, educated person such as Bauman could in good faith rely thereon in hope of earning a profit independent of tax considerations. See Lieber v. Commissioner, T.C. Memo. 1993-424.

Reliance on the advice of professionals may serve to defeat a finding of negligence, but we are not convinced that

petitioners have shown that the purported reliance in the instant case was reasonable. See Freytag v. Commissioner, 89 T.C. 849, 889 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). "In the face of a transaction which clearly lacked economic substance, and which was designed to produce tax benefits out of proportion with total investment, * * * [petitioners' arguments] do not establish the exercise of due care." Hildebrand v. Commissioner, 967 F.2d 350, 353 (9th Cir. 1992), affg. Ames v. Commissioner, T.C. Memo. 1990-87. Had there been a bona fide examination of the offering materials, no ordinarily prudent person would have found ERL to be a legitimate investment. "Warning bells tolled, but * * * [Bauman] ignored them". Freytag v. Commissioner, supra at 889; see also Kantor v. Commissioner, 998 F.2d 1514, 1522-1523 (9th Cir. 1993), affg. in part and revg. in part T.C. Memo. 1990-380. At the very least, Bauman was negligent. Accordingly, respondent's determination that petitioners are liable for the addition to tax under section 6653(a) for 1980 and additions to tax under section 6653(a)(1) and (2) for 1981 and 1982 is sustained.

Issue 7. Section 6621(c)

Section 6621(c) provides for an increased rate of interest with respect to any substantial underpayment of tax attributable to one or more tax motivated transactions. An underpayment is substantial if it exceeds $1,000. Sec. 6621(c)(2). A tax-motivated transaction includes any sham or fraudulent

transaction. Sec. 6621(c)(3)(A)(v). Additionally, section 6621(c)(3)(B) authorizes the Secretary to specify by regulation additional types of transactions which will be treated as tax-motivated transactions. Section 301.6621-2T, Q&A-4, Temporary Proced. & Admin. Regs., 49 Fed. Reg. 50392 (Dec. 28, 1984), provides that deductions disallowed for any period in the case of an activity not engaged in for profit within the meaning of section 183 are considered to be attributable to a tax-motivated transaction.

Petitioners contend that section 6621(c) cannot be properly applied to them because the "any sham or fraudulent transaction" clause of section 6621(c)(3)(A)(v) was not added to the Internal Revenue Code until 1984, which was after the years presently at issue. This argument must fail. The statute, as so amended, applies to interest accrued after December 31, 1984, even though the transaction was entered into prior to that date. See Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986); Kozlowski v. Commissioner, T.C. Memo. 1993-430, affd. without published opinion 70 F.3d 1279 (9th Cir. 1995).

The section 6621(c) increased rate of interest does not apply to deductions disallowed on separate and independent grounds which do not fall within the specified categories of tax-motivated transactions. McCrary v. Commissioner, 92 T.C. 827, 858-860 (1989). Here, we have sustained the disallowance of

the deductions claimed as advance minimum royalty payments under section 1.612-3(b), Income Tax Regs. The basis for disallowance of the advance minimum royalty payments is independent of and separable from the tax-motivated transactions upon which the other deductions of ERL were disallowed. Therefore, to the extent that petitioners' underpayment of tax is attributable to the disallowed advance minimum royalty payments, petitioners are not liable for the increased interest under section 6621(c). All other disallowed deductions, however, have been sustained on grounds of economic sham and lack of profit objective. Accordingly, petitioners will be liable for increased interest under section 6621(c) for the underpayment in tax attributable to these adjustments, if the underpayments for each year exceed $1,000.

Issue 8. Late Filing Addition to Tax

Section 6651(a)(1) provides for an addition to tax for failure to timely file a Federal income tax return. Section 6651(a)(1) also provides for an exception to this addition when the taxpayer shows that the failure to file was due to reasonable cause and not due to willful neglect. Willful neglect has been defined as "a conscious, intentional failure or reckless indifference". United States v. Boyle, 469 U.S. 241, 245 (1985). Merely demonstrating an absence of willful neglect does not meet the burden of proof required of the taxpayer; the taxpayer must also make an affirmative showing that a reasonable

cause existed for the untimely filing.  Paula Constr. Co. v. Commissioner, 58 T.C. 1055, 1061 (1972), affd. without published opinion 474 F.2d  1345 (5th Cir. 1973).  In order to establish reasonable cause, petitioners must show that they exercised ordinary business care and prudence and were nevertheless unable to file the return by the prescribed date.  Crocker v. Commissioner, 92 T.C. 899, 913 (1989); sec. 301.6651-1(c)(1), Proced. & Admin. Regs.

Petitioners advance three arguments with respect to this issue.  First, petitioners argue that their failure to timely file their 1982 return was due to Bauman's preoccupation with his father's ailing health and that such preoccupation constitutes sufficient cause to excuse their untimely filing.  Petitioners further argue that the late filing addition to tax should not be applied to them because their 1982 return was in fact filed prior to the expiration of the automatic 4-month extension period that they would have received had they filed an application for an extension of time to file.  Finally, petitioners argue that the late filing addition to tax should not be applied to them because their explanation for the untimely filing was accepted by an agent for respondent when their 1982 return was being audited in 1983.

Respondent, in contrast, contends that petitioners' failure to timely file their 1982 return was not due to reasonable cause, but rather due to willful neglect.  Respondent explains that

despite the poor health of Bauman's father, Bauman managed to continue his practice of law. This ability to continue managing his normal affairs, respondent contends, indicates that Bauman was not so overwhelmed by his concern for his father that he could not comply with his obligation to file the tax return. Respondent also argues that Bauman's concern for his father did not preclude Mrs. Bauman from fulfilling their obligation to file a timely return. We agree with respondent.

Petitioners have not established that their failure to file their 1982 tax return by the prescribed date was due to reasonable cause and not due to willful neglect. While we appreciate the emotional difficulties Bauman may have experienced while caring for his father, the record does not support his contention that he was so overwhelmed by his father's deteriorating health as to preclude a timely filing. The fact that Bauman continued to practice law throughout this period indicates that his father's condition did not prevent him from filing the return on time. See Dickerson v. Commissioner, T.C. Memo. 1990-577. Moreover, petitioners failed to explain why Mrs. Bauman was unable to satisfy the couple's obligation to file a timely return.

We reject petitioners' contention that the late filing addition to tax should not be applied to them merely because their return was in fact filed prior to the expiration of the 4-month extension period that would have been granted automatically

had they filed an application for extension of time to file.  The fact remains that no such extension was applied for or granted. We also reject petitioners' argument that the late filing addition to tax should not be applied to them in light of discussions which they allegedly had with respondent's agent regarding the untimely filing.  Bauman's testimony as to the nature of these discussions was self-serving, and the record lacks evidence to corroborate his testimony.  Accordingly, respondent's determination as to this issue is sustained.

To reflect the foregoing,

<u>Decisions will be</u>

<u>entered under Rule 155.</u>